1    Ben F. Pierce Gore (SBN 128515)
     PRATT & ASSOCIATES
2    1871 The Alameda
     Suite 425
3    San Jose, CA 95126
     (408) 429-6506
4    pgore@prattattorneys.com

5    Charles Barrett
     CHARLES BARRETT, P.C.
6    6518 Highway 100
     Suite 210
7    Nashville, TN 37205
     (615) 515-3393
8    charles@cfbfirm.com

9    *Attorneys for Plaintiffs*

10

11                   UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14

15   JUDE TRAZO, JENNA COFFEY,              Case No. 12-cv-02272 (PSG)
     MARIANNA BELLI, individually and on
16   behalf of all others similarly situated,
                                            **SECOND AMENDED CLASS ACTION**
17              Plaintiffs,                 **AND REPRESENTATIVE ACTION**
                                            **COMPLAINT FOR EQUITABLE AND**
18   v.                                     **INJUNCTIVE RELIEF**

19   NESTLÉ USA, INC.,
                                            **JURY TRIAL DEMANDED**
20              Defendant.

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT - CASE NO. 12-CV-02272 (PSG)

Plaintiffs, through their undersigned attorneys, bring this lawsuit against Defendant Nestlé USA, Inc. ("Defendant" or "Nestlé") as to their own acts upon personal knowledge and as to all other matters upon information and belief.

## DEFINITIONS

1.     "Class Period" is May 4, 2008 to the present.

2.     "Purchased Products" are the following seven products purchased by the Plaintiffs during the Class Period:  (1) Nestlé Eskimo Pie Dark Chocolate, (2) Nestlé Juicy Juice (Apple), (3) Dreyer's "All Natural" Fruit Bars (Strawberry), (4) Nestlé Coffee Mate Powder (Original), (5) Nestlé Rich Milk Chocolate Cocoa, (6) Nestlé Nesquik Chocolate Syrup and (7) Buitoni Alfredo Sauce.  Pictures of the Purchased Products are attached as Exhibits 1 - 7 and specific descriptions of the relevant label representations are included below.

3.     "Substantially Similar Products" are the Defendant's products listed below.  These products make the exact same representations as the listed Purchased Products, violate the exact same regulations in the same manner, and are essentially the exact same products, except for flavor, as Nestlé Juicy Juice (Apple), Dreyer's "All Natural" Fruit Bars (Strawberry), Nestlé Coffee Mate Powder (Original), and Nestlé Rich Milk Chocolate Cocoa as follows:

<u>Similar to Nestlé Juicy Juice (Apple)</u>
Nestlé Juicy Juice (Apple Raspberry)
Nestlé Juicy Juice (Berry)
Nestlé Juicy Juice (Cherry)
Nestlé Juicy Juice (Grape)
Nestlé Juicy Juice (Kiwi Strawberry)
Nestlé Juicy Juice (Mango)
Nestlé Juicy Juice (Orange Tangerine)
Nestlé Juicy Juice (Fruit Punch)
Nestlé Juicy Juice (Strawberry Banana)
Nestlé Juicy Juice (Tropical)
Nestlé Juicy Juice (White Grape)

<u>Similar to Dreyer's "All Natural" Fruit Bars (Strawberry)</u>
Dreyer's "All Natural" Fruit Bars (Lemonade)
Dreyer's "All Natural" Fruit Bars (Lime)
Dreyer's "All Natural" Fruit Bars (Coconut)
Dreyer's "All Natural" Fruit Bars (Grape)
Dreyer's "All Natural" Fruit Bars (Tangerine)
Dreyer's "All Natural" Fruit Bars (Blueberry Acai)
Dreyer's "All Natural" Fruit Bars (Pomegranate)
Edy's "All Natural" Fruit Bars (Lemonade)
Edy's "All Natural" Fruit Bars (Lime)

1        Edy's "All Natural" Fruit Bars (Strawberry)
Edy's "All Natural" Fruit Bars (Coconut)
2        Edy's "All Natural" Fruit Bars (Grape)
Edy's "All Natural" Fruit Bars (Tangerine)
3        Edy's "All Natural" Fruit Bars (Blueberry Acai)

4        <u>Similar to Nestlé Coffee Mate Powder (Original)</u>
Nestlé Coffee Mate Powder (Hazelnut)
5        Nestlé Coffee Mate Powder (Vanilla Caramel)
Nestlé Coffee Mate Powder (Creamy Chocolate)
6        Nestlé Coffee Mate Powder (French Vanilla)
Sugar Free Nestlé Coffee Mate Powder (Hazelnut)
7        Sugar Free Nestlé Coffee Mate Powder (Vanilla Caramel)
Sugar Free Nestlé Coffee Mate Powder (French Vanilla)
8

9        <u>Similar to Nestlé Rich Milk Chocolate Cocoa</u>
Nestlé Mini Marshmallows Cocoa
Nestlé Dark Chocolate Cocoa
10      Nestlé Chocolate Caramel Cocoa
Nestlé Chocolate Mint Cocoa
11      Nestlé Women's Wellness Cocoa
Nestlé No Sugar Added Cocoa
12      Nestlé Fat Free Cocoa

13      4.     Plaintiffs reserve the right to supplement this list if evidence is adduced during

14 discovery to show that other of Defendant's products had labels which violate the same

15 provisions of the Sherman Law and have the same label representations as the Purchased

16 Products.

17                        **SUMMARY OF THE CASE**

18                               *Misbranding*

19      5.     Plaintiffs' case has two distinct facets.  First, the "misbranding" part.  This case

20 seeks to recover for the injuries suffered by the Plaintiffs and the Class as a direct result of the

21 Defendant's unlawful sale of misbranded food products. Defendant packaged and labeled its

22 Purchased Products in violation of California's Sherman Law which adopts, incorporates, and is,

23 in all relevant aspects, identical to the federal Food Drug & Cosmetic Act, 21 U.S.C. § 301 *et seq.*

24 ("FDCA") and the regulations adopted pursuant to that act.  These violations render Defendant's

25 food products "misbranded."  Defendant's actions violate the unlawful prong of California's

26 Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL") and the Consumers Legal

27 Remedies Act, Cal. Civ. Code §1750, *et seq.* ("CLRA").

28

6.      Under California law, misbranded food products cannot be legally sold or possessed, have no economic value and are legally worthless.  Indeed, the sale or possession of misbranded food products is a criminal act in California.

7.      By selling such illegal products to the unsuspecting Plaintiffs, the Defendant profited at the Plaintiffs' expense and unlawfully deprived Plaintiffs of the money they paid to purchase food products that were illegal to sell, possess or resell and had no economic value.

8.      California law is clear that reliance by Plaintiffs or the Class members is not a necessary element for a plaintiff to prevail under the UCL unlawful prong or the CLRA for a claim based on the sale of an illegal product.

9.      Thus, the unlawful sale of a misbranded product that was illegal to sell or possess – standing alone without any allegations of deception by Defendant, or review of or reliance on the labels by Plaintiffs – gives rise to causes of action under the UCL and CLRA.  In short, Defendant's injury causing unlawful conduct in selling an illegal product to an unsuspecting consumer is the only necessary element needed for UCL and CLRA liability. All Plaintiffs need to show is that they bought an unlawful product and were injured as a result. This claim does not sound in fraud. In the present case, Plaintiffs were injured by the Defendant's illegal sale of its misbranded Purchased Products. Plaintiffs paid money to purchase illegal products that were worthless and could not be legally sold or possessed. Plaintiffs were also unwittingly placed in a worse legal situation as a result of Defendant's unlawful sale of illegal products to them. Plaintiffs would not have purchased Defendant's Purchased Products had they known that the products were illegal and could not be lawfully possessed. No reasonable consumer would purchase such a product. The Class suffered the same injuries as Plaintiffs due to the Class' purchase of the Purchased Products.

10.     Defendant has violated the Sherman Law § 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold or offer for sale any food that is misbranded. As discussed below, the illegal sale of a misbranded product to a consumer results in an independent violation of the unlawful prong of the UCL and CLRA that is separate and apart from the underlying unlawful labeling practice that resulted in the product being misbranded. While not

1  required, the Plaintiffs relied on the fact that the Defendant's Purchased Products were legal and

2  that its labeling and label claims were legal.

3      11.    Due to Defendant's misbranding of the Purchased Products, Plaintiffs lost money

4  by purchasing unlawful products.

5                              ***Misleading and Deceptive***

6      12.    Second, the "misleading" part. In addition to being misbranded under the Sherman

7  Law, each Purchased Product has label statements that are misleading, deceptive and fraudulent.

8  These label statements are (1) "*No Sugar Added*" on Nestlé Eskimo Pie Dark Chocolate (2) "*No

9  Sugar Added*" and "*All Natural*" on Nestlé Juicy Juice (Apple), (3) "*All Natural*" on Dreyer's

10  "All Natural" Fruit Bars (Strawberry), (4) "*0g Trans Fat*" on Nestlé Coffee Mate, (5)

11  "*Antioxidants help to protect cells from damage and calcium helps to build strong bones*" on

12  Nestlé Rich Milk Chocolate Cocoa and (6) the number of calories and serving size on Nestlé

13  Nesquik Chocolate Syrup and Buitoni Alfredo Sauce.

14      13.    Prior to purchase, Plaintiffs reviewed the illegal "No Sugar Added," "All Natural,"

15  "0g Trans Fat," "Antioxidants help to protect cells from damage and calcium helps to build strong

16  bones," and the serving size and calories (on the syrup and alfredo sauce) statements on the labels

17  of each respective Purchased Product they purchased, reasonably relied, in substantial part, on

18  these misleading statements, and was thereby misled in deciding to buy the Purchased Products.

19  Plaintiffs were deceived into purchasing the Purchased Products in substantial part because of

20  these label statements and because of these statements believed that the Purchased Products were

21  healthier than other similar products.

22      14.    Defendant also misled Plaintiffs to believe that the Purchased Products were legal

23  to purchase and possess. Had Plaintiffs known that the Purchased Products were misbranded they

24  would not have bought Defendant's Purchased Products. Plaintiffs relied (a) on the Defendant's

25  explicit representations that its products contained "No Sugar Added," were "All Natural," had

26  "0g Trans Fat," and contained antioxidants to "help to protect cells from damage and calcium

27  helps to build strong bones" and were thus healthier than other similar products lacking such

28

1  statements and (b) the Defendant's implicit representation based on Defendant's material

2  omission of material facts that these Purchased Products were legal to sell and possess.

3       15.    Reasonable consumers would be, and were, misled in the same manner as

4  Plaintiffs.

5       16.    Defendant had a duty to disclose the illegality of its misbranded products because

6  (a) it had exclusive knowledge of material facts not known or reasonably accessible to the

7  Plaintiffs; and (b) the Defendant actively concealed a material fact from the Plaintiffs. The

8  Defendant had a duty to disclose the information required by the labeling laws discussed herein

9  because of the disclosure requirements contained in those laws and because in making its "No

10 Sugar Added," "All Natural," "0g Trans Fat," and "Antioxidants help to protect cells from

11 damage and calcium helps to build strong bones" and serving size claims it made partial

12 representations that are misleading because other material facts have not been disclosed.

13                    **PARTIES, JURISDICTION AND VENUE**

14      17.    Plaintiff Trazo is a resident of San Jose, California who purchased Defendant's

15 Coffee Mate Powder (Original) in California during the Class Period.  A copy of the label

16 purchased by Plaintiff Trazo is attached as Exhibit 1.

17      18.    Plaintiff Coffey is a resident of Sonoma, California who purchased Defendant's

18 Juicy Juice (Apple) in California during the Class Period.   A copy of the label purchased by

19 Plaintiff Coffey is attached as Exhibit 2.

20      19.    Plaintiff Belli is a resident of San Jose, California who purchased Defendant's

21 Eskimo Pie Dark Chocolate, Dreyer's "All Natural" Fruit Bars (Strawberry), Rich Milk

22 Chocolate Cocoa, Nesquik Chocolate Syrup, and Buitoni Alfredo Sauce in California during the

23 Class Period.   Copies of the labels purchased by Plaintiff Belli are attached as Exhibits 3-7.

24      20.    Defendant Nestlé USA, Inc. is a privately held Delaware corporation with its

25 corporate headquarters and principal place of business in Glendale, California.  Nestlé USA, Inc.

26 sells products under various brand names including Dreyer's brand products.

27

28

21.     Defendant is a leading producer of retail food products, including Purchased Products. It sells its food products to consumers through grocery and other retail stores throughout California and the United States.

22.     California law applies to all claims set forth in this Second Amended Complaint because Nestlé is a California resident and all of the misconduct alleged herein was contrived in, implemented in, and has a shared nexus with California.  The formulation and execution of the unlawful and misleading practices alleged herein, occurred in, or emanated from California. Accordingly, California has significant contacts and/or a significant aggregation of contacts with the claims asserted by Plaintiffs and all class members.

23.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which:  (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

24.     This Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

25.     This Court has personal jurisdiction over Defendant because: (i) a substantial portion of the wrongdoing alleged in this Second Amended Complaint occurred in California, (ii) Defendant is authorized to do business in California, (iii) Defendant has sufficient minimum contacts with California, and (iv) Defendant otherwise intentionally availed itself of the markets in California through the promotion, marketing and sale of merchandise, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

26.     Because a substantial part of the events or omissions giving rise to these claims occurred in this district and because this Court has personal jurisdiction over Defendant, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

# BACKGROUND

## A.    Identical California and Federal Law Regulate Food Labeling

27.    Food manufacturers are required to comply with identical state and federal laws and regulations that govern the labeling of food products.  First and foremost among these is the FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

28.    Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state."  California Health & Safety Code § 110100.

29.    Under both the Sherman Law and FDCA Section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or its labeling. Cal. Health & Safety Law §§ 110660, 110705; 21 U.S.C. § 343.

30.    In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations.  As described herein, Defendant has violated the following Sherman Law sections:  California Health & Safety Code § 110390 (unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product); California Health & Safety Code § 110395 (unlawful to manufacture, sell, deliver, hold or offer to sell any falsely advertised food); California Health & Safety Code §§ 110398 and 110400 (unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely advertised); California Health & Safety Code § 110660 (misbranded if label is false and misleading); California Health & Safety Code § 110665 (misbranded if label fails to conform to the requirements set forth in 21 U.S.C. § 343(q)); California Health & Safety Code § 110670 (misbranded if label fails to conform with the requirements of 21 U.S.C. § 343(r)); California Health & Safety Code § 110705 (misbranded if words, statements and other information required by the Sherman Law are either missing or not sufficiently conspicuous);

1    California Health & Safety Code § 110740 (misbranded if contains artificial flavoring, artificial

2    coloring and chemical preservatives but fails to adequately disclose that fact on label); California

3    Health & Safety Code § 110765 (which makes it unlawful for any person to misbrand any food);

4    California Health & Safety Code § 110770 (unlawful for any person to receive in commerce any

5    food that is misbranded or to deliver or proffer for delivery any such food).

6         31.    Plaintiffs' claims are brought for violation of the Sherman Law.

7    **B.    FDA Enforcement History**

8         32.    In recent years the FDA has become increasingly concerned that food

9    manufacturers have been disregarding food labeling regulations. To address this concern, the

10   FDA elected to take steps.  In October 2009, the FDA issued a *Guidance for Industry: Letter*

11   *regarding Point Of Purchase Food Labeling* and on March 3, 2010 the FDA issued "*Open Letter*

12   *to Industry from [FDA Commissioner] Dr. Hamburg*" to inform the food industry of its concerns

13   and to place the industry on notice that food labeling compliance was an area of enforcement

14   priority.  Additionally, the FDA has sent warning letters to the industry, including many of

15   Defendant's peer food manufacturers as well as a December 4, 2009 Warning Letter to Nestle,

16   Inc., for some of the same types of misbranded labels and deceptive labeling claims described

17   herein.

18        33.    Defendant did see, or should have seen, these warnings.  Defendant did not change

19   its labels in response to any warning letters.

20   **SHERMAN LAW VIOLATIONS AND THE PURCHASED PRODUCTS**

21   **A.    Nestlé Eskimo Pie Dark Chocolate**

22        34.    Plaintiff Belli purchased Nestlé Eskimo Pie Dark Chocolate during the Class

23   Period.

24        35.    For purposes of this case, there are no Substantially Similar Products to Nestlé

25   Eskimo Pie Dark Chocolate.

26        **1.    The Nestlé Eskimo Pie Dark Chocolate is Misbranded Under the
                  Sherman Law**

27

28        36.    The label on the package of Nestlé Eskimo Pie Dark Chocolate violates the

1   Sherman Law and is therefore misbranded.

2       37.     A copy of the label of Nestlé Eskimo Pie Dark Chocolate purchased by Plaintiff

3   Belli is attached as Exhibit 3.

4       38.     The label on the package of Nestlé Eskimo Pie Dark Chocolate purchased by

5   Plaintiff Belli states "No Sugar Added."  All packages of Nestlé Eskimo Pie Dark Chocolate sold

6   in the Class Period have the same "No Sugar Added" statement.

7       39.     "No Sugar Added" is a nutrient content claim.

8       40.     21 C.F.R. § 101.60 contains special requirements for nutrient claims that use the

9   phrase "no sugar added."  21 C.F.R. § 101.60 has been adopted and expressly incorporated by the

10  Sherman Law, California Health & Safety Code § 110100, and provides in 101.60(c)(2) that:

11
12      (2) The terms "no added sugar," "without added sugar," or "***no sugar added***" may
        be used only if:

13
14      (i) No amount of sugars, as defined in § 101.9(c)(6)(ii), or any other ingredient
        that contains sugars that functionally substitute for added sugars is added during
        processing or packaging; and

15      (ii) The product does not contain an ingredient containing added sugars such as
        jam, jelly, or concentrated fruit juice; and

16
17      (iii) The sugars content has not been increased above the amount present in the
        ingredients by some means such as the use of enzymes, except where the intended
        functional effect of the process is not to increase the sugars content of a food, and
        a functionally insignificant increase in sugars results; and

18
19      (iv) The food that it resembles and for which it substitutes normally contains
        added sugars; and

20      (v) ***The product bears a statement that the food is not "low calorie" or "calorie***
        ***reduced"*** (unless the food meets the requirements for a "low" or "reduced

21      calorie" food) ***and that directs consumer's attention to the nutrition panel for***
        ***further information on sugar and calorie content***.

22
23      41.     21 C.F.R. § 101.60(b)(2) provides that:

24      The terms "low-calorie," "few calories," "contains a small amount of calories,"
        "low source of calories," or "low in calories" may be used on the label or in

25      labeling of foods, except meal products as defined in § 101.13(l) and main dish
        products as defined in § 101.13(m), provided that: (i)(A) The food has a reference

26      amount customarily consumed greater than 30 grams (g) or greater than 2
        tablespoons and does not provide more than 40 calories per reference amount

27      customarily consumed; or (B) The food has a reference amount customarily
        consumed of 30 g or less or 2 tablespoons or less and does not provide more than

28      40 calories per reference amount customarily consumed and, except for sugar

1

2

substitutes, per 50 g ….(ii) If a food meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to vary the caloric content, it is labeled to clearly refer to all foods of its type and not merely to the particular brand to which the label attaches (e.g., "celery, a low-calorie food").

3

42.     The labels for Defendant's Eskimo Pie Dark Chocolate have "no sugar added" on

4

the front panel, so under 21 C.F.R. § 101.60(c)(2), there must be an additional two statements on

5

the label:  (1) a statement that the product is not "low calorie" or "calorie reduced" (unless the

6

exception applies) and (2) a statement that directs consumer's attention to the nutrition panels for

7

further information on sugar and calorie content.

8

43.     There is no statement that directs consumer's attention to the nutrition panels for

9

further information on sugar and calorie content on the label of Defendant's Eskimo Pie Dark

10

Chocolate.  For this reason, the Eskimo Pie Dark Chocolate does not satisfy element (v) of 21

11

C.F.R. § 101.60(c)(2) and is misbranded.

12

44.     There is also no statement that the product is not "low calorie" or "calorie

13

reduced" on the label of Defendant's Eskimo Pie Dark Chocolate.  This product does not meet the

14

requirements for a "low" or "reduced calorie" food under California and federal law so the

15

exception within the first requirement of 21 C.F.R. § 101.60(c)(2) does not apply.  The label must

16

therefore bear such a statement. For this reason, Defendant's Eskimo Pie Dark Chocolate does not

17

satisfy element (v) of 21 C.F.R. § 101.60(c)(2) and is therefore misbranded.

18

45.     Eskimo Pie Dark Chocolate is not "low calorie" as defined in 21 C.F.R. §

19

101.60(b)(2).  The label states that this product has a serving size of 50 grams per bar.  Each

20

serving has 150 calories.  This exceeds the 40 calorie limit imposed by 21 C.F.R. § 101.60(b)(2)

21

for a product to be considered "low calorie."

22

46.     Eskimo Pie Dark Chocolate is not "reduced calorie" as defined in 21 C.F.R. §

23

101.60(b)(4)(i) and 21 C.F.R. § 101.13(j)(1)(ii) because it does not contain at least 25% fewer

24

calories than an appropriate "market basket" reference product.

25

47.     The Eskimo Pie Dark Chocolate are 50 grams per serving size with 150 calories

26

per bar.  To be "reduced calorie" the amount of calories per serving is determined, however,

27

based on a reference amount customarily consumed of 85 grams.  The Eskimo Pie Dark

28

1   Chocolate are therefore not 150 calories per bar for these purposes, but really 255 calories per

2   bar.  For Eskimo Pie Dark Chocolate to be 25% less calories than an appropriate market based

3   reference product such a similar product must have at least 340 calories.  Most, if not all, such

4   similar products have fewer than 340 calories.  For example, the Haagen-Dazs Vanilla Milk

5   Chocolate ice cream bars have a serving size of 280 calories per 83 grams.  If this was the

6   reference product, Eskimo Pie Dark Chocolate would have to be 210 calories per reference

7   amount customarily consumed to label itself "reduced calorie." Because it made a no sugar added

8   claim, Defendant was also required by 21  C.F.R. § 105.66 to place a conspicuous labeling

9   statement on the package of Eskimo Pie Dark Chocolate bars to  inform consumers that the

10  product contained both nutritive and non-nutritive sweeteners to alert consumers of the fact that

11  the product contained calorific sweeteners.

12          48.     Defendant's violations of the Sherman Law include Defendant's illegal labeling

13  practices which misbrand the Eskimo Pie Dark Chocolate as well as the illegal advertising,

14  marketing, distribution, delivery and sale of Defendant's misbranded Eskimo Pie Dark Chocolate

15  to consumers in California and throughout the United States.

16          49.     Defendant could have easily complied with the labeling regulations by simply

17  adding two statements on the label:  (1) a statement that the product is not "low calorie" or

18  "calorie reduced" (because the exception does not apply) and (2) a statement that directs

19  consumer's attention to the nutrition panels for further information on sugar and calorie content.

20          50.     As a result, consumers, including Plaintiff Belli and the Class, bought products

21  that fail to comply with the mandatory labeling requirements and standards established by law

22  such that the products are misbranded and rendered unfit for sale.

23          51.     Plaintiff Belli and the Class have been damaged by Defendant's illegal conduct in

24  that they purchased misbranded and worthless products that were illegal to sell or possess based

25  on Defendant's illegal labeling of the products and otherwise lost money.

26          52.     Plaintiff Belli reasonably relied on the omission of fact/misrepresentation that

27  Defendant's Eskimo Pie Dark Chocolate bars were not misbranded under the Sherman Law and

28  were therefore legal to buy and possess. However, reliance is not required to prove a claim under

the unlawful prong of the UCL or the CLRA. Plaintiff Belli would not have purchased Eskimo Pie Dark Chocolate had she known they were illegal to purchase and possess.

53.     Because of the violations of 21 C.F.R. § 101.60 and Sherman Law § 110100, Defendant's products are misbranded under Sherman Law § 110660, Sherman Law § 110670 and Sherman Law § 110705. Defendant's act of selling a misbranded product violates Sherman Law § 110760 which prohibits the sale or possession of misbranded products.

54.     Defendant's sale of these misbranded Eskimo Pie Dark Chocolate bars results in an independent violation of the unlawful prong that is separate from the labeling violation. Defendant committed two separate illegal acts that give rise to claims under the unlawful prong. The first arises from Defendant's unlawful "No Sugar Added" label statement on its Eskimo Pie Dark Chocolate. When Plaintiff Belli relied on these claims to her detriment when purchasing Defendant's Eskimo Pie Dark Chocolate she was injured and therefore has a claim arising from her purchase of a product in reliance on the illegal "No Sugar Added" labeling claims made by Defendant.

55.     The second is arising when Defendant sold an illegal product in an unlawful sale. The only necessary element of this latter claim is Defendant's sale of a misbranded product that injured Plaintiff Belli whose injury arises from the unlawful sale of an illegal product that is unlawful to sell and unlawful to possess. No reliance by the consumer is necessary. Plaintiff Belli has been deprived of money in an illegal sale and given a worthless illegal product in return. In addition, due to the law's prohibition of possession of such a product, Plaintiff Belli has been unwittingly placed by the Defendant's conduct in a legal position that no reasonable consumer would agree to be placed.

### 2.     The "No Sugar Added" Label Statement on Nestlé Eskimo Pie Dark Chocolate Is Misleading and Deceptive

56.     Plaintiff Belli read and relied upon Defendant's front of package "No Sugar Added" label statement on Eskimo Pie Dark Chocolate and Plaintiff was thus deceived.

57.     21 C.F.R. § 101.60(c)(1) states that "consumers may ***reasonably be expected*** to regard terms that represent that the food contains no sugars or sweeteners e.g., 'sugar free,' or 'no

1    sugar,' as indicating a product which is low in calories or significantly reduced in calories."

2    (emphasis added).

3         58.    Because consumers may reasonably be expected to regard terms that represent that

4    the food contains "no sugar added" or sweeteners as indicating a product which is in fact low in

5    calories or significantly reduced in calories, consumers are misled when foods that are not low-

6    calorie as a matter of law are falsely represented, through the use of phrases like "no sugar added"

7    that they are not allowed to bear due to its high calorific levels and absence of mandated

8    disclaimer or disclosure statements.

9         59.    Eskimo Pie Dark Chocolate is not low calorie or significantly reduced in calories.

10        60.    Defendant's conduct misled Plaintiff Belli because, with Defendant failing to

11   include the required disclosure that the Eskimo Pie Dark Chocolate is not "low calorie" or

12   "calorie reduced," Plaintiff Belli was misled into believing Defendant's Eskimo Pie Dark

13   Chocolate to be a healthier choice than other similar products. Plaintiff Belli is conscious of the

14   healthiness of the products she purchases, and Defendant's omitted information deprived Plaintiff

15   Belli of her ability to take into account those foods' contributions, or not, to Plaintiff Belli's total

16   dietary composition.

17        61.    Plaintiff Belli reasonably relied on the "No Sugar Added" label representation

18   when making her purchase decision and was misled by the "No Sugar Added" representations as

19   described herein. Plaintiff Belli was also misled by the defendant's failure to conspicuously

20   disclose the fact that its product contained nutritive sweeteners as required by law.

21        62.    Plaintiff Belli would not have purchased Eskimo Pie Dark Chocolate had she

22   known the truth about this product, *i.e.*, that it was not as healthy as described.  Plaintiff Belli had

23   other food alternatives that satisfied such standards and Plaintiff Belli also had cheaper

24   alternatives.  Reasonable consumers would have been misled in the same identical manner as

25   Plaintiff Belli.

26        63.    Plaintiff Belli was misled to believe that the Eskimo Pie Dark Chocolate was

27   healthier, and, as a result, she purchased the Eskimo Pie Dark Chocolate.  Plaintiff Belli was

28   misled and deceived through the very means and methods the FDA sought to regulate.

64.     Plaintiff Belli and the Class would not have purchased the Eskimo Pie Dark Chocolate had they not been misled by Defendant's "No Sugar Added" claim.

**B.     Nestlé Juicy Juice (Apple)**

65.     Plaintiff Coffey purchased Nestlé Juicy Juice (Apple) during the Class Period.

66.     The following Substantially Similar Products were sold by Defendant during the Class Period and are similar to Nestlé Juicy Juice (Apple) in that they are essentially the same product (juice), make the same "No Sugar Added" and "All Natural" statements, are misbranded in the same way, misleading in the same way, and violate the same regulations in the same manner as described herein.

> Nestlé Juicy Juice (Apple Raspberry)
> Nestlé Juicy Juice (Berry)
> Nestlé Juicy Juice (Cherry)
> Nestlé Juicy Juice (Grape)
> Nestlé Juicy Juice (Kiwi Strawberry)
> Nestlé Juicy Juice (Mango)
> Nestlé Juicy Juice (Orange Tangerine)
> Nestlé Juicy Juice (Fruit Punch)
> Nestlé Juicy Juice (Strawberry Banana)
> Nestlé Juicy Juice (Tropical)
> Nestlé Juicy Juice (White Grape)

**1.     The Nestlé Juicy Juice (Apple) Is Misbranded Under the Sherman Law**

67.     The label on the package of Nestlé Juicy Juice (Apple) violates the Sherman Law and is therefore misbranded.

68.     A copy of the label of Nestlé Juicy Juice (Apple) purchased by Plaintiff Coffey is attached as Exhibit 2.

69.     The label on the package of Nestlé Juicy Juice (Apple) purchased by Plaintiff Coffey states "No Sugar Added" and "All Natural."  All packages of Nestlé Juicy Juice (Apple) sold in the Class Period have the same "No Sugar Added" and "All Natural" statements.

*"No Sugar Added" Misbrands Nestlé Juicy Juice (Apple)*

70.     Paragraphs 40-41 are incorporated as if fully set forth herein.

71.     The labels for Defendant's Nestlé Juicy Juice (Apple) have "no sugar added" on the front panel so under 21 C.F.R. § 101.60(c)(2), there must be an additional two statements on

the label:  (1) a statement that the product is not "low calorie" or "calorie reduced" (unless the exception applies) and (2) a statement that directs consumer's attention to the nutrition panels for further information on sugar and calorie content.

72.     There is no statement that directs consumer's attention to the nutrition panels for further information on sugar and calorie content on the label of Defendant's Nestlé Juicy Juice (Apple).  For this reason, the Nestlé Juicy Juice (Apple) does not satisfy element (v) of 21 C.F.R. § 101.60(c)(2) and is misbranded.

73.     There is also no statement that the product is not "low calorie" or "calorie reduced" on the label of Defendant's Nestlé Juicy Juice (Apple).  This product does not meet the requirements for a "low" or "reduced calorie" food under California and federal law so the exception within the first requirement of 21 C.F.R. § 101.60(c)(2) does not apply.  The label must therefore bear such a statement. For this reason, Defendant's Nestlé Juicy Juice (Apple) does not satisfy element (v) of 21 C.F.R. § 101.60(c)(2) and is therefore misbranded.

74.     Nestlé Juicy Juice (Apple) is not "low calorie" as defined in 21 C.F.R. § 101.60(b)(2).  The label for the 4.23 ounce Juicy Juice purchased by Plaintiff Coffey states that this product has a serving size of 60 calories per serving.  This exceeds the 40 calorie limit imposed by 21 C.F.R. § 101.60(b)(2) for a product to be considered "low calorie."

75.     No other size or flavor of Nestlé Juicy Juice has less than 60 calories per serving. All exceed the 40 calorie limit imposed by 21 C.F.R. § 101.60(b)(2) for a product to be considered "low calorie."  For example, all other sizes of Nestlé Juicy Juice (Apple) have even more calories per serving and also exceed 40 calories:  10-oz bottle (140 calories), 46-oz bottle (110 calories), 64-oz bottle (110 calories), 6.75-oz box (100 calories), 46-oz can (110 calories).

76.     Nestlé Juicy Juice (Apple) is not "reduced calorie" as defined in 21 C.F.R. § 101.60(b)(4)(i) and 21 C.F.R. § 101.13(j)(1)(ii) because it does not contain at least 25% fewer calories than an appropriate "market basket" reference product.

77.     Defendant's violations of the Sherman Law include Defendant's illegal labeling practices which misbrand the Nestlé Juicy Juice (Apple) as well as the illegal advertising, marketing, distribution, delivery and sale of Defendant's misbranded Nestlé Juicy Juice (Apple)

1   to consumers in California and throughout the United States.

2       78.     Defendant could have easily complied with the labeling regulations by simply

3   adding two statements on the label:  (1) a statement that the product is not "low calorie" or

4   "calorie reduced" (because the exception does not apply) and (2) a statement that directs

5   consumer's attention to the nutrition panels for further information on sugar and calorie content.

6       79.     Defendant's use of "No Sugar Added" on Nestlé Juicy Juice (Apple) also violates

7   the Sherman Law because Defendant is prohibited from making nutrient content claims on food

8   intended specifically for use by infants and children less than two years of age.  21 C.F.R. §

9   101.13(b)(3) (prohibiting all nutrient content claims on products intended for children under two,

10  except as specifically provided for elsewhere); 21 C.F.R. § 101.60(c)(4) (allowing "No Added

11  Sugar" claims only with respect to dietary supplements or vitamins intended for children under

12  two).

13      80.     Nutrient content claims on products intended to be consumed by children under

14  two are barred because the nutritional needs of children are very different from those of adults.

15      81.     All such products are misbranded within the meaning of section FDCA §

16  403(r)(1)(A) and 21 U.S.C. § 43(r)(1)(A) because the labeling includes unauthorized nutrient

17  content claims. The circumstances under which such claims are permitted are defined in 21

18  C.F.R. §101.60(c). These regulations do not allow the claim for products specifically intended for

19  children under two years of age.

20      82.     Nestlé Juicy Juice (Apple) is food intended specifically for use by infants and

21  children less than two years of age.   The front of the package even states "Great for Toddlers."

22      83.     FDA regulations authorize the use of a limited number of defined nutrient content

23  claims.  In addition, FDA's regulations authorize the use of only certain synonyms for these

24  defined terms. If a nutrient content claim or its synonym is not included in the food labeling

25  regulations, it cannot be used on a label. Only those claims, or their synonyms, that are

26  specifically defined in the regulations may be used.  All other claims are prohibited. 21 C.F.R. §

27  101.13(b).

28      84.     Only approved nutrient content claims will be permitted on the food label, and all

other nutrient content claims will misbrand a food. It should thus be clear which type of claim is prohibited and which permitted. Food manufacturers are on notice that the use of an unapproved nutrient content claim is prohibited conduct. 58 F.R. § 2302.  In addition, 21 U.S.C. § 343(r)(2) prohibits using unauthorized undefined terms, and it declares foods that do so to be misbranded.

85.     Defendant received warning letters from the FDA on December 4, 2009 about similar nutrient content claims on products intended for children under two.  This letter states, in relevant part:

> This product is marketed specifically for children under two years of age, as indicated by the claim "Helps support brain development***In children under two years old," which appears on the product label. The label also bears the nutrient content claim "no sugar added." The circumstances under which a "no sugar added" claim is permitted are defined in 21 CFR 101.60(c). That regulation does not allow the claim for conventional food products intended for use in children under age 2. 21 CFR 101.60(c)(4). Therefore, the claim "no sugar added" misbrands your product.

86.     Defendant ignored this warning letter.

***"All Natural" Misbrands Nestlé Juicy Juice (Apple)***

87.     The label on the package of Nestlé Juicy Juice (Apple) purchased by Plaintiff Coffey states "All Natural."  All packages of Nestlé Juicy Juice (Apple) sold in the Class Period have the same statement.

88.     All of Defendant's Nestlé Juicy Juice (Apple) sold during the Class Period have contains the following artificial ingredients:  ascorbic acid and citric acid.

89.     The Substantially Similar Products listed above also all have the "All Natural" statement and contain ascorbic acid and/or citric acid.

90.     In its rule-making and warning letters to manufacturers, the FDA has repeatedly stated its policy to restrict the use of the term "natural" in connection with added color, synthetic substances and flavors as provided in 21 C.F.R. § 101.22.

91.     The FDA has also repeatedly affirmed its policy regarding the use of the term "natural" as meaning that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food.

92.     The FDA considers use of the term "natural" on a food label to be truthful and non-misleading when "nothing artificial or synthetic…has been included in, or has been added to, a food that would not normally be expected to be in the food." *See* 58 FR 2302, 2407, January 6, 1993.

93.     Any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources. Further, the FDA distinguishes between natural and artificial flavors in 21 C.F.R. § 101.22. California Health & Safety Code § 110740 prohibits the use of artificial flavoring, artificial coloring and chemical preservatives unless those ingredients are adequately disclosed on the labeling.

94.     Any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources. Further, the FDA distinguishes between natural and artificial flavors in 21 C.F.R. § 101.22.

95.     The 2009 FOP Guidance Sec. 587.100, which states: "[t]he use of the words 'food color added,' 'natural color,' or similar words containing the term 'food' or 'natural' may be erroneously interpreted to mean the color is a naturally occurring constituent in the food. Since all added colors result in an artificially colored food, we would object to the declaration of any added color as 'food' or 'natural.'"

96.     Likewise, California Health & Safety Code § 110740 prohibits the use of artificial flavoring, artificial coloring and chemical preservatives unless those ingredients are adequately disclosed on the labeling.

97.     21 C.F.R. § 70.3(f) makes clear that "where a food substance such as beet juice is deliberately used as a color, as in pink lemonade, it is a color additive." Similarly, any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources. The FDA distinguishes between natural and artificial flavors in 21 C.F.R. § 101.22.

98.     The FDA has sent out numerous warning letters to companies in which it has addressed "All Natural" claims. In these letters, the FDA has informed the receiving companies

1     that their products labeled "All Natural" were misbranded where they contained synthetic and

2     artificial ingredients.

3         99.     For example, on August 16, 2001, the FDA sent a warning letter to Oak Tree Farm

4     Dairy, Inc.  The letter "found serious violations" of the Federal Food, Drug and Cosmetic Act and

5     Title 21, Code of Federal Regulations, Part 101 – Food Labeling (21 CFR 101), and stated in

6     pertinent part:

7
8
9
10
11

> The term "all natural" on the "OAKTREE ALL NATURAL LEMONADE" label
> is inappropriate because the product contains potassium sorbate.  Although FDA
> has not established a regulatory definition for "natural," we discussed its use in the
> preamble to the food labeling final regulations (58 Federal Register 2407, January
> 6, 1993, copy enclosed).  FDA's policy regarding the use of "natural," means
> nothing artificial or synthetic has been included in, or has been added to, a food
> that would not normally be expected to be in the food.  The same comment applies
> to use of the terms "100 % NATURAL" and "ALL NATURAL" on the
> "OAKTREE REAL BREWED ICED TEA" label because it contains citric acid.

12     http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2001/ucm178712.htm.

13         100.     Defendant knew or should have known of these warning letters and other similar

14     ones.  Despite the FDA's numerous warnings to industry, Defendant has continued to sell its

15     Nestlé Juicy Juice (Apple) labeled "All Natural" that in fact contains artificial ingredients.

16         101.     Defendant's violations of the Sherman Law include Defendant's illegal labeling

17     practices which misbrand the Nestlé Juicy Juice (Apple) as well as the illegal advertising,

18     marketing, distribution, delivery and sale of Defendant's misbranded Nestlé Juicy Juice (Apple)

19     to consumers in California and throughout the United States.

20         102.     As a result, consumers, including Plaintiff Coffey and the Class, bought products

21     that fail to comply with the mandatory labeling requirements and standards established by law

22     such that the products are misbranded and rendered unfit for sale.

23         103.     Plaintiff Coffey and the Class have been damaged by Defendant's illegal conduct

24     in that they purchased misbranded and worthless products that were illegal to sell or possess

25     based on Defendant's illegal labeling of the products and otherwise lost money.

26         104.     Plaintiff Coffey reasonably relied on the omission of fact/misrepresentation that

27     Defendant's Nestlé Juicy Juice (Apple) were not misbranded under the Sherman Law and were

28     therefore legal to buy and possess. However, reliance is not required to prove a claim under the

1   unlawful prong of the UCL or the CLRA. Plaintiff Coffey would not have purchased Nestlé Juicy

2   Juice (Apple) had she known they were illegal to purchase and possess.

3       105.    Defendant's Nestlé Juicy Juice (Apple) is misbranded under Sherman Law §

4   110660, Sherman Law § 110670 and Sherman Law § 110705. Defendant's act of selling a

5   misbranded product violates Sherman Law § 110760 which prohibits the sale or possession of

6   misbranded products.

7       106.    Defendant's sale of these misbranded Nestlé Juicy Juice (Apple) results in an

8   independent violation of the unlawful prong that is separate from the labeling violation.

9   Defendant committed two separate illegal acts that give rise to claims under the unlawful prong.

10  The first arises from Defendant's unlawful "No Sugar Added" and "All Natural" label statements

11  on its Nestlé Juicy Juice (Apple). When Plaintiff Coffey relied on these claims to her detriment

12  when purchasing Defendant's Nestlé Juicy Juice (Apple) she was injured and therefore has a

13  claim arising from her purchase of a product in reliance on the illegal "No Sugar Added" and "All

14  Natural" labeling claims made by Defendant.

15      107.    The second is arising when Defendant sold an illegal product in an unlawful sale.

16  The only necessary element of this latter claim is Defendant's sale of a misbranded product that

17  injured Plaintiff Coffey whose injury arises from the unlawful sale of an illegal product that is

18  unlawful to sell and unlawful to possess. No reliance by the consumer is necessary. Plaintiff

19  Coffey has been deprived of money in an illegal sale and given a worthless illegal product in

20  return. In addition, due to the law's prohibition of possession of such a product, Plaintiff Coffey

21  has been unwittingly placed by the Defendant's conduct in a legal position that no reasonable

22  consumer would agree to be placed.

23          **2.    The "No Sugar Added," and "All Natural" Label Statements on Nestlé
                   Juicy Juice (Apple) Are Misleading and Deceptive**

24

25      108.    Plaintiff Coffey read and relied upon Defendant's front of package "No Sugar

26  Added" label statement on Nestlé Juicy Juice (Apple) and Plaintiff was thus deceived.

27      109.    21 C.F.R. § 101.60(c)(1) states that "consumers may ***reasonably be expected*** to

28  regard terms that represent that the food contains no sugars or sweeteners e.g., 'sugar free,' or 'no

1    sugar,' as indicating a product which is low in calories or significantly reduced in calories."

2    (emphasis added).

3        110.    Because consumers may reasonably be expected to regard terms that represent that

4    the food contains "no sugar added" or sweeteners as indicating a product which is in fact low in

5    calories or significantly reduced in calories, consumers are misled when foods that are not low-

6    calorie as a matter of law are falsely represented, through the use of phrases like "no sugar added"

7    that they are not allowed to bear due to its high calorific levels and absence of mandated

8    disclaimer or disclosure statements.

9        111.    Nestlé Juicy Juice (Apple) is not low calorie or significantly reduced in calories.

10       112.    Defendant's conduct misled Plaintiff Coffey because, with Defendant failing to

11   include the required disclosure that the Nestlé Juicy Juice (Apple) is not "low calorie" or "calorie

12   reduced," Plaintiff Coffey was misled into believing Defendant's Nestlé Juicy Juice (Apple) to be

13   a healthier choice than other similar products. Plaintiff Coffey is conscious of the healthiness of

14   the products she purchases, and Defendant's omitted information deprived Plaintiff Coffey of her

15   ability to take into account those foods' contributions, or not, to Plaintiff Coffey's total dietary

16   composition.

17       113.    Plaintiff Coffey reasonably relied on the "No Sugar Added" label representation

18   when making her purchase decision and was misled by the "No Sugar Added" representations as

19   described herein.

20       114.    Plaintiff Coffey would not have purchased Nestlé Juicy Juice (Apple) had she

21   known the truth about this product, *i.e.*, that it was not as healthy as described.  Plaintiff Coffey

22   had other food alternatives that satisfied such standards and Plaintiff Coffey also had cheaper

23   alternatives.  Reasonable consumers would have been misled in the same identical manner as

24   Plaintiff Coffey.

25       115.    Plaintiff Coffey was misled to believe that the Nestlé Juicy Juice (Apple) was

26   healthier, and, as a result, she purchased the Nestlé Juicy Juice (Apple).  Plaintiff Coffey was

27   misled and deceived through the very means and methods the FDA sought to regulate.

28

116.    Plaintiff Coffey and the Class would not have purchased the Nestlé Juicy Juice (Apple) had they not been misled by Defendant's "No Sugar Added" claim.

117.    Plaintiff Coffey also read and relied upon Defendant's front of package "All Natural" label statement on Nestlé Juicy Juice (Apple), and Plaintiff was thus deceived.

118.    Defendant's conduct misled Plaintiff Coffey because, with Defendant failing to adequately disclose the presence of artificial ingredients, Plaintiff Coffey was misled into believing Defendant's product to be a healthier choice than other similar products.  Plaintiff Coffey is conscious of the healthiness of the products she purchases, and Defendant's misleading "All Natural" statement deprived Plaintiff Coffey of her ability to take into account those foods' contributions, or not, to Plaintiff's total dietary composition. Defendant concealed the deleterious attributes of its food, and Plaintiff was misled and deceived, both by Defendant's statements of the healthy attributes ("All Natural") and failure to adequately disclose the added artificial ingredients. Plaintiff Coffey was misled by the Defendant's unlawfully prominent display of the ostensible good traits of its product and unlawful failure to disclose the bad.

119.    Plaintiff Coffey reasonably relied on the "All Natural" label representation when making her purchase decisions and was misled by the "All Natural" representations as described below.

120.    Plaintiff Coffey would not have purchased Nestlé Juicy Juice (Apple) had she known the truth about these products, i.e. that the products were not truly "all natural." Plaintiff Coffey had other food alternatives that satisfied such standards and Plaintiff Coffey also had cheaper alternatives.  Reasonable consumers would have been misled in the same identical manner as Plaintiff Coffey.

121.    Plaintiff Coffey and the Class would not have purchased the Nestlé Juicy Juice (Apple) had she not been misled by Defendant's unlawful "All Natural" claims and been properly informed by Defendant of the added artificial ingredients in those products, and had they otherwise not have been improperly misled and deceived as stated herein.

122.    A reasonable consumer would expect that when Defendant labels its products as "All Natural," the product's ingredients are "natural" as defined by the federal government and its

1   agencies.  A reasonable consumer would also expect that when Defendant labels its products as

2   "All Natural" the product ingredients are "natural" according to the common use of that word.  A

3   reasonable consumer would, furthermore, expect that "All Natural" products do not contain added

4   artificial ingredients.

5        123.     Consumers are thus misled into purchasing Defendant's Nestlé Juicy Juice (Apple)

6   that are not "All Natural" as falsely represented on its labeling.

7        **C.**     **Dreyer's "All Natural" Fruit Bars (Strawberry)**

8        124.     Plaintiff Belli purchased Dreyer's "All Natural" Fruit Bars (Strawberry) during the

9   Class Period.

10       125.     The following Substantially Similar Products were sold by Defendant during the

11  Class Period and are similar to Dreyer's "All Natural" Fruit Bars (Strawberry) in that they are

12  essentially the same product (fruit bars), make the same "All Natural" statement, are misbranded

13  in the same way, misleading in the same way, and violate the same regulations in the same

14  manner as described herein.

15
16            Dreyer's "All Natural" Fruit Bars (Lemonade)
          Dreyer's "All Natural" Fruit Bars (Lime)
          Dreyer's "All Natural" Fruit Bars (Coconut)

17            Dreyer's "All Natural" Fruit Bars (Grape)
          Dreyer's "All Natural" Fruit Bars (Tangerine)

18            Dreyer's "All Natural" Fruit Bars (Blueberry Acai)
          Dreyer's "All Natural" Fruit Bars (Pomegranate)

19            Edy's "All Natural" Fruit Bars (Lemonade)
          Edy's "All Natural" Fruit Bars (Lime)

20            Edy's "All Natural" Fruit Bars (Strawberry)
          Edy's "All Natural" Fruit Bars (Coconut)

21            Edy's "All Natural" Fruit Bars (Grape)
          Edy's "All Natural" Fruit Bars (Tangerine)

22            Edy's "All Natural" Fruit Bars (Blueberry Acai)

23       **1.**     **The Dreyer's "All Natural" Fruit Bars (Strawberry) Is Misbranded
Under the Sherman Law**

24       126.     Paragraphs 90-99 above are incorporated by reference as if fully set forth herein.

25       127.     The label on the package of Dreyer's "All Natural" Fruit Bars (Strawberry)

26  violates the Sherman Law and is therefore misbranded.

27       128.     A copy of the label of Dreyer's "All Natural" Fruit Bars (Strawberry) purchased

28  by Plaintiff Belli is attached as Exhibit 4.

129.    The label on the package of Dreyer's "All Natural" Fruit Bars (Strawberry) purchased by Plaintiff Belli states "All Natural."  All packages of Dreyer's "All Natural" Fruit Bars (Strawberry) sold in the Class Period have the same "All Natural" statement.

130.    The label of Defendant's Dreyer's "All Natural" Fruit Bars (Strawberry) states on the front panel that the product is "all natural" but the label on the back panel also states the product contains the following artificial ingredients:  beet juice extract (color), turmetic color, ascorbic acid, and citric acid.

131.    Defendant sold its Dreyer's "All Natural" Fruit Bars (Strawberry) even though the labels represented this product: (i) as "all natural" when it actually contains artificial ingredients such as citric acid or ascorbic acid used to preserve food and/or impart tart flavor to products that lack such flavor naturally and (ii) as "all natural" when it contained color additives such as beet juice.

132.    The Substantially Similar Products listed above also all have the "All Natural" statement and contain beet juice extract (color), turmetic color, ascorbic acid, and/or citric acid.

133.    Defendant's violations of the Sherman Law include Defendant's illegal labeling practices which misbrand the Dreyer's "All Natural" Fruit Bars (Strawberry) as well as the illegal advertising, marketing, distribution, delivery and sale of Defendant's misbranded Dreyer's "All Natural" Fruit Bars (Strawberry) to consumers in California and throughout the United States.

134.    As a result, consumers, including Plaintiff Belli and the Class, bought products that fail to comply with the mandatory labeling requirements and standards established by law such that the products are misbranded and rendered unfit for sale.

135.    Plaintiff Belli and the Class have been damaged by Defendant's illegal conduct in that they purchased misbranded and worthless products that were illegal to sell or possess based on Defendant's illegal labeling of the products and otherwise lost money.

136.    Plaintiff Belli reasonably relied on the omission of fact/misrepresentation that Defendant's Dreyer's "All Natural" Fruit Bars (Strawberry) were not misbranded under the Sherman Law and were therefore legal to buy and possess. However, reliance is not required to prove a claim under the unlawful prong of the UCL or the CLRA. Plaintiff Belli would not have

1   purchased Dreyer's "All Natural" Fruit Bars (Strawberry) had she known they were illegal to

2   purchase and possess.

3        137.   Defendant's Dreyer's "All Natural" Fruit Bars (Strawberry) is misbranded under

4   Sherman Law § 110660, Sherman Law § 110670 and Sherman Law § 110705. Defendant's act of

5   selling a misbranded product violates Sherman Law § 110760 which prohibits the sale or

6   possession of misbranded products.

7        138.   Defendant's sale of these misbranded Dreyer's "All Natural" Fruit Bars

8   (Strawberry) results in an independent violation of the unlawful prong that is separate from the

9   labeling violation. Defendant committed two separate illegal acts that give rise to claims under

10  the unlawful prong. The first arises from Defendant's unlawful "All Natural" label statement on

11  its Dreyer's "All Natural" Fruit Bars (Strawberry). When Plaintiff Belli relied on these claims to

12  her detriment when purchasing Defendant's Dreyer's "All Natural" Fruit Bars (Strawberry) she

13  was injured and therefore has a claim arising from her purchase of a product in reliance on the

14  illegal "All Natural" labeling claim made by Defendant.

15       139.   The second is arising when Defendant sold an illegal product in an unlawful sale.

16  The only necessary element of this latter claim is Defendant's sale of a misbranded product that

17  injured Plaintiff Belli whose injury arises from the unlawful sale of an illegal product that is

18  unlawful to sell and unlawful to possess. No reliance by the consumer is necessary. Plaintiff Belli

19  has been deprived of money in an illegal sale and given a worthless illegal product in return. In

20  addition, due to the law's prohibition of possession of such a product, Plaintiff Belli has been

21  unwittingly placed by the Defendant's conduct in a legal position that no reasonable consumer

22  would agree to be placed.

23       **2.   The "All Natural" Label Statement on Dreyer's "All Natural" Fruit
       Bars (Strawberry) Is Misleading and Deceptive**

24

25       140.   Plaintiff Belli also read and relied upon Defendant's front of package "All

26  Natural" label statement on Dreyer's "All Natural" Fruit Bars (Strawberry), and Plaintiff was thus

27  deceived.

28

141.   Defendant's conduct misled Plaintiff Belli because, with Defendant failing to adequately disclose the presence of artificial ingredients and added coloring, Plaintiff Belli was misled into believing Defendant's product to be a healthier choice than other similar products. Plaintiff Belli is conscious of the healthiness of the products she purchases, and Defendant's misleading "All Natural" statement deprived Plaintiff Belli of her ability to take into account those foods' contributions, or not, to Plaintiff's total dietary composition. Defendant concealed the deleterious attributes of its food, and Plaintiff was misled and deceived, both by Defendant's statements of the healthy attributes ("All Natural") and failure to adequately disclose the added artificial ingredients and added coloring. Plaintiff Belli was misled by the Defendant's unlawfully prominent display of the ostensible good traits of its product and unlawful failure to disclose the bad.

142.   Plaintiff Belli reasonably relied on the "All Natural" label representation when making her purchase decisions and was misled by the "All Natural" representations as described below.

143.   Plaintiff Belli would not have purchased Dreyer's "All Natural" Fruit Bars (Strawberry) had she known the truth about these products, i.e. that the products were not truly "all natural." Plaintiff Belli had other food alternatives that satisfied such standards and Plaintiff Belli also had cheaper alternatives.  Reasonable consumers would have been misled in the same identical manner as Plaintiff Belli.

144.   Plaintiff Belli and the Class would not have purchased the Dreyer's "All Natural" Fruit Bars (Strawberry) had she not been misled by Defendant's unlawful "All Natural" claims and been properly informed by Defendant of the added artificial ingredients and added coloring in those products, and had they otherwise not have been improperly misled and deceived as stated herein.

145.   A reasonable consumer would expect that when Defendant labels its products as "All Natural," the product's ingredients are "natural" as defined by the federal government and its agencies.  A reasonable consumer would also expect that when Defendant labels its products as "All Natural" the product ingredients are "natural" according to the common use of that word.  A

reasonable consumer would, furthermore, expect that "All Natural" products do not contain added artificial ingredients.

146.     Consumers are thus misled into purchasing Defendant's Dreyer's "All Natural" Fruit Bars (Strawberry) that are not "All Natural" as falsely represented on its labeling.

**D.     Nestlé Coffee Mate Powder (Original)**

147.     Plaintiff Trazo purchased Nestlé Coffee Mate Powder (Original) during the Class Period.

148.     The following Substantially Similar Products were sold by Defendant during the Class Period and are similar to Nestlé Coffee Mate Powder (Original) in that they are essentially the same product, make the same "0g Trans Fat" statement, are misbranded in the same way (fat content is too high), misleading in the same way (no required disclaimer), and violate the same regulations in the same manner as described herein.

> Nestlé Coffee Mate Powder (Hazelnut)
> Nestlé Coffee Mate Powder (Vanilla Caramel)
> Nestlé Coffee Mate Powder (Creamy Chocolate
> Nestlé Coffee Mate Powder (French Vanilla)
> Sugar Free Nestlé Coffee Mate Powder (Hazelnut)
> Sugar Free Nestlé Coffee Mate Powder (Vanilla Caramel)
> Sugar Free Nestlé Coffee Mate Powder (French Vanilla)

**1.     The Nestlé Coffee Mate Powder (Original) Is Misbranded
        Under the Sherman Law**

149.     The label on the package of Nestlé Coffee Mate Powder (Original) violates the Sherman Law and is therefore misbranded.

150.     A copy of the label of Nestlé Coffee Mate Powder (Original) is attached as Exhibit 1.

151.     The label on the package of Nestlé Coffee Mate Powder (Original) purchased by Plaintiff Trazo states "0g Trans Fat."  All packages of Nestlé Coffee Mate Powder (Original) sold in the Class Period have the same "0g Trans Fat" statement.

152.     "0g Trans Fat" is a nutrient content claim.

153.     21 C.F.R. § 101.13 (h)(l) has been adopted and incorporated by the Sherman Law, Cal. Health & Safety Code § 110100, and provides that:

If a food … contains more than 13.0 g of fat, 4.0 g of saturated fat, 60 milligrams (mg) of cholesterol, or 480 mg of sodium per reference amount customarily consumed, per labeled serving, or, for a food with a reference amount customarily consumed of 30 g or less … per 50 g … then that food must bear a statement disclosing that the nutrient exceeding the specified level is present in the food as follows: "See nutrition information for __ content" with the blank filled in with the identity of the nutrient exceeding the specified level, e.g., "See nutrition information for fat content."

154.    Defendant's use of the "0g Trans Fat" label statement violates the Sherman Law because Nestlé Coffee Mate Powder (Original) does not contain the required disclosure statement referring consumers to the nutrition panel for additional information.  This disclosure statement is required pursuant to 21 C.F.R. § 101.13(h) and California law. Defendant's Nestlé Coffee Mate (Original) contains more than 13g of total fat and more than 4 grams of saturated fat per 50 grams, and therefore the disclosure statement required by 21 C.F.R. § 101.13(h) and Cal. Health & Safety Code § 110100 is required.

155.    All packages of Nestlé Coffee Mate Powder (Original) sold in the Class Period fail to make the disclosure statement.

156.    The failure to include the required disclosure statement renders the Nestlé Coffee Mate Powder (Original) misbranded under the Sherman Law.

157.    The FDA agrees.  On February 22, 2010, Spectrum Organic Products, Inc. received a warning letter from the FDA.  The letter states, in relevant part:

In addition, your "Organic All Vegetable Shortening" product is misbranded because your product's label bears a nutrient content claim but fails to bear the disclosure statement required by 21 CFR 101.13(h). Your product bears the phrase "0 Grams Trans Fat" in two different locations on the principal display panel of the product label. The phrase "0 Grams Trans Fat" meets the definition of a nutrient content claim because it characterizes the product's level of trans fat, which is a nutrient of the type required to be in nutrition labeling (21 CFR 101.13(b)). The Nutrition Facts panel declares the nutrient value of 6 g saturated fat per serving (1 Tbsp). A food that bears a nutrient content claim that contains more than 4 g of saturated fat per serving must bear a disclosure statement on the label (immediately adjacent to the claim) referring the consumer to nutrition information for that nutrient, e.g., "See nutrition information for saturated fat content," as required by 21 CFR 101.13(h)(1); however, the label of your product fails to bear the required disclosure statement.

158.    Defendant's violations of the Sherman Law include Defendant's illegal labeling practices which misbrand the Nestlé Coffee Mate Powder (Original) as well as the illegal

advertising, marketing, distribution, delivery and sale of Defendant's misbranded Nestlé Coffee Mate Powder (Original) to consumers in California and throughout the United States.

159.   Defendant could have easily complied with the labeling regulations by simply adding a disclosure statement to the front of its package under its "0g Trans Fat" statements.

160.   As a result, consumers, including Plaintiff Trazo and the Class, bought products that fail to comply with the mandatory labeling requirements and standards established by law such that the products are misbranded and rendered unfit for sale. These products contained levels of fat the FDA has deemed to be deleterious to health and do not contain the required disclosure statement informing consumers of the levels of fat contained in Defendant's products.

161.   Plaintiff Trazo and the Class have been damaged by Defendant's illegal conduct in that they purchased misbranded and worthless products that were illegal to sell or possess based on Defendant's illegal labeling of the products and otherwise lost money.

162.   Plaintiff Trazo reasonably relied on the omission of fact/misrepresentation that Defendant's Nestlé Coffee Mate Powder (Original) was not misbranded under the Sherman Law and were therefore legal to buy and possess. However, reliance is not required to prove a claim under the unlawful prong of the UCL or the CLRA. Plaintiff Trazo would not have purchased Nestlé Coffee Mate Powder (Original) had she known they were illegal to purchase and possess.

163.   Because of the violations of 21 C.F.R. § 101.13 and Sherman Law § 110100, Defendant's products are misbranded under Sherman Law § 110660, Sherman Law § 110670 and Sherman Law § 110705. Defendant's act of selling a misbranded product violates Sherman Law § 110760 which prohibits the sale or possession of misbranded products.

164.   Defendant's sale of these misbranded Nestlé Coffee Mate Powder (Original) results in an independent violation of the unlawful prong that is separate from the labeling violation. Plaintiff Trazo has two distinct claims under the unlawful prong. The first arises from Defendant's unlawful "0g Trans Fat" label statement on its Nestlé Coffee Mate Powder (Original). When Plaintiff Trazo relied on these claims to her detriment when purchasing Defendant's Nestlé Coffee Mate Powder (Original) he was injured and therefore has a claim

1    arising from her purchase of a product in reliance on the illegal "0g Trans Fat" labeling claims

2    made by Defendant.

3        165.    Plaintiff Trazo has a second, independent claim arising from being sold an illegal

4    product in an unlawful sale. The only necessary element of this latter claim is Defendant's sale of

5    a misbranded product that injured Plaintiff Trazo whose injury arises from the unlawful sale of an

6    illegal product that is unlawful to sell and unlawful to possess. No reliance by the consumer is

7    necessary. Plaintiff Trazo has been deprived of money in an illegal sale and given a worthless

8    illegal product in return. In addition, due to the law's prohibition of possession of such a product,

9    Plaintiff Trazo has been unwittingly placed by the Defendant's conduct in a legal position that no

10   reasonable consumer would agree to be placed.

11                    **2.    The "0g Trans Fat" Label Statement on Nestlé Coffee Mate
                             Powder (Original) Is Misleading and Deceptive**

12

13       166.    Plaintiff Trazo read and relied upon Defendant's front of package "0g Trans Fat"

14   label statement, and Plaintiff Trazo was thus deceived.

15       167.    Plaintiff Trazo was further unaware that Defendant's Nestlé Coffee Mate Powder

16   (Original) contained total fat at levels in the food that, according to the FDA, "may increase the

17   risk of disease or health related condition that is diet related."  Because of Defendant's unlawful

18   and misleading "0g Trans Fat" claim and omitted disclosure statement, Plaintiff Trazo was misled

19   to believe that the product was healthier than other non-dairy products by containing no

20   appreciable levels of trans fats.

21       168.    Plaintiff Trazo was misled to believe the products did not contain fat and saturated

22   at levels that may increase the risk of disease or health related conditions. Defendant's "0g Trans

23   Fat" label claims and omitted disclosure statement led Plaintiff Trazo to believe that Nestlé

24   Coffee Mate Powder (Original) were a healthier choice than other similar products. In addition,

25   Plaintiff Trazo did not know, and had no reason to know, that Defendant's Nestlé Coffee Mate

26   Powder (Original) were misbranded by the "0g Trans Fat" nutrient claim despite failing to meet

27   the requirements to make those nutrient claims.

28

169.    21 C.F.R. § 1.21 establishes that failure to disclose material facts is a violation of the disclosure rules and is *per se* "misleading." The fat and saturated fat which Defendant failed to disclose is material.

170.    Defendant repeatedly violated these provisions when it prominently stated "0g Trans Fat" on its labels of Nestlé Coffee Mate Powder (Original) without the mandatory disclosure statement.

171.    The "0g Trans Fat" claim on Nestlé Coffee Mate (Original) is misleading as this product  contains disqualifying levels of fat which exceed the 13 gram disclosure threshold and disqualifying levels of saturated fat which exceed the 4 gram disclosure threshold.

172.    Pursuant to 21 C.F.R. § 101.13(h), Defendant is prohibited from making the unqualified nutrient claims of "0g Trans Fat" claim on its food products if its products contain fat in excess of 13 grams, saturated fat in excess of 4 grams, cholesterol in excess of 60 milligrams, or sodium in excess of 480mg per 50 grams, unless the product also displays a disclosure statement that informs consumers of the product's fat, saturated fat and sodium levels.

173.    These regulations are intended to ensure that consumers are not misled into the erroneous belief that a product that claims to be low in trans fat, but actually has other unhealthy fat levels, is a healthy or healthier choice, because of the lack of trans fats.

174.    Nevertheless, Defendant's products' labels stated that its products contained "0g Trans Fat" without such a disclosure even though the Nestlé Coffee Mate Powder (Original) contain fat in excess of 12 grams per serving.

175.    In October 2009, the FDA issued its FOP Guidance, to address its concerns about front of package labels. Despite the issuance of the 2009 FOP Guidance, Defendant did not remove the improper and misleading "0g Trans Fat" nutrient content claims from its Nestlé Coffee Mate Powder (Original).

176.    Notwithstanding the Open Letter listed above, Defendant continued to use this improper trans fat nutrient content claim, despite the express guidance of the FDA in the Open Letter that "claims that a product is free of trans fats, which imply that the product is a better choice than products without the claim, can be misleading when a product is high in saturated fat

1   [or sodium, cholesterol or total fat], and especially so when the claim is not accompanied by the

2   required statement referring consumers to the more complete information on the Nutrition Facts

3   panel."

4        177.   Defendant also ignored the FDA's Guidance for Industry, A Food Labeling Guide,

5   which detailed the FDA's guidance on how to make nutrient content claims about food products

6   that contain "one or more nutrients [like total fat at levels] in the food that may increase the risk

7   of disease or health related condition that is diet related."  Defendant utilized improper trans fat

8   nutrient claims on the labels of its Defendant's Nestlé Coffee Mate Powder (Original).  As such,

9   these products ran afoul of FDA guidance as well as California and federal law.

10       178.   The FDA has issued at least nine other warning letters to other companies for the

11  same identical type of improper "0g Trans Fat" nutrient content claims at issue in this case.

12       179.   This Court has found this exact kind of label representation to be misleading.

13       180.   "A disqualifying level of, say, saturated fat is four grams per 'reference amount

14  customarily consumed.'" 21 C.F.R. § 101.13(h)(1); *Chacanaca v. Quaker Oats Co.*, 752 F. Supp.

15  2d 1111 (N.D. Cal. 2010).  If this level is exceeded, a food purveyor is prohibited from making an

16  unqualified claim touting the health benefits of another nutrient in the food.  *Id.*  This is because

17  the Agency has reasoned that the beneficent claim, standing alone, would be misleading."  *Id.*

18       181.   This Court has already held that a disqualifying claim such as Defendant's "0

19  grams Trans Fat," even if accurate, may be unlawful and misleading. *Wilson v. Frito-Lay North*

20  *America, Inc*., 2013 WL 1320468 (N.D. Cal. April 1, 2013)(Plaintiff sufficiently alleged claim

21  that the "0 Grams Trans Fat" statement on bags of potato chips was deceptive because,

22  accompanied by a disclosure of at least one of the ingredients that 21 C.F.R. § 101.13(h)(1)

23  requires to be disclosed, they and other reasonable consumers would think that the statements on

24  the labels make accurate claims about the labeled products' nutritional content when, in fact, they

25  do not; disqualifying claim such as "0 grams Trans Fat," even if accurate, may be unlawful and

26  misleading).

27       182.   In *Chacanaca*, Judge Seeborg explained:

28

The federal regulatory statute provides for this precise scenario: that is, it categorizes as misleading and therefore prohibited even true nutrient content claims if the presence of another "disqualifying" nutrient exceeds and amount established by regulation. The Agency has by regulation imposed "disqualifying" levels for only four nutrients: total fat, saturated fat, cholesterol, and sodium. 21 C.F.R. §§ 101.13(h)(1), 101.14(a)(4). It is important to note how disqualifying claims work. A disqualifying level of say, saturated fat is four grams per "reference amount customarily consumed." 21C.F.R. § 101.13 (h)(1). If this level is exceeded, a food purveyor is prohibited from making an unqualified claim touting the health benefits of another nutrient in the food. This is because the Agency has reasoned that the beneficent claim, standing alone, would be misleading.

*Chacanaca*, 752 F. Supp. 2d at 1122 (emphasis in original).

183.    Despite the FDA's numerous warnings to industry, Defendant continued to sell Nestlé Coffee Mate Powder (Original) bearing improper "0g Trans Fat" nutrient content claim without meeting the requirements to make this claim.

184.    Defendant's conduct misled Plaintiff Trazo because, with Defendant failing to disclose the high fat, Plaintiff Trazo was misled into believing Defendant's product to be a healthier choice than other similar products. Plaintiff Trazo is conscious of the healthiness of the products she purchases, and Defendant's unlawful statements and omitted mandatory disclosures deprived Plaintiff Trazo of her ability to take into account those foods' contributions, or not, to Plaintiff Trazo's total dietary composition. Defendant concealed the deleterious attributes of its food, and Plaintiff Trazo was misled and deceived, both by Defendant's statements of the healthy attributes ("0g Trans Fat") and failure to disclose the deleterious food attributes (fat content over 13g and saturated fat over 4g). Plaintiff Trazo was misled by the Defendant's unlawfully prominent display of the ostensible good traits of its product, and unlawful failure to disclose the bad.

185.    Plaintiff Trazo reasonably relied on the "0g Trans Fat" label representation when making her purchase decisions and was misled by the "0g Trans Fat" representations as described below.

186.    Plaintiff Trazo would not have purchased Nestlé Coffee Mate Powder (Original) had he known the truth about these products, i.e. that the products failed to only make positive contributions to Plaintiff Trazo's diet and that the products contain one or more nutrients like total

1    fat at levels in the food that increased the risk of disease and/or dietary health related conditions

2    and that the Nestlé Coffee Mate Powder (Original) were not "healthier" than other similar

3    products.  Plaintiff Trazo had other food alternatives that satisfied such standards and Plaintiff

4    Trazo also had cheaper alternatives.

5         187.    Reasonable consumers would have been misled in the same identical manner as

6    Plaintiff Trazo.  A reasonable consumer would be unaware that Defendant's Nestlé Coffee Mate

7    Powder (Original) contained total fat at levels in the food that, according to the FDA, "may

8    increase the risk of disease or health related condition that is diet related."  Because of

9    Defendant's unlawful and misleading "0g Trans Fat" claim and omitted disclosure statement, a

10   reasonable consumer would be misled to believe that the product was healthier than other similar

11   by containing no appreciable levels of trans fats.

12        188.    A reasonable consumer would be misled to believe the products did not contain fat

13   at levels that may increase the risk of disease or health related conditions. Defendant's "0g Trans

14   Fat" label claims and omitted disclosure statement would lead reasonable consumers to believe

15   that Nestlé Coffee Mate Powder (Original) were a healthier choice than other similar products.

16        189.    Defendant's unlawful failure to use the mandatory disclosure is actionable.

17   Plaintiff Trazo was unlawfully misled to believe that the products were low in fat by the "0g

18   Trans Fat" statement, and, as a result, he purchased the Nestlé Coffee Mate Powder (Original).

19   Plaintiff Trazo was misled and deceived through the very means and methods the FDA sought to

20   regulate.

21        190.    Plaintiff Trazo and the Class would not have purchased the Nestlé Coffee Mate

22   Powder (Original) had they not been misled by Defendant's unlawful "0g Trans Fat" claims and

23   been properly informed by Defendant of the deleterious attributes of those products, and had they

24   otherwise not have been improperly misled and deceived as stated herein.

25        **E.    Nestlé Rich Milk Chocolate Cocoa**

26        191.    Plaintiff Belli purchased Nestlé Rich Milk Chocolate Cocoa during the Class

27   Period.

28

192.   The following Substantially Similar Products were sold by Defendant during the Class Period and are similar to Nestlé Rich Milk Chocolate Cocoa in that they are essentially the same product (cocoa), make the same "*Antioxidants help to protect cells from damage and calcium helps to build strong bones*" statement, are misbranded in the same way, misleading in the same way, and violate the same regulations in the same manner as described herein.

> Nestlé Mini Marshmallows Cocoa
> Nestlé Dark Chocolate Cocoa
> Nestlé Chocolate Caramel Cocoa
> Nestlé Chocolate Mint Cocoa
> Nestlé Women's Wellness Cocoa
> Nestlé No Sugar Added Cocoa
> Nestlé Fat Free Cocoa

### 1.   The Nestlé Rich Milk Chocolate Cocoa Is Misbranded Under the Sherman Law

193.   The label on the package of Nestlé Rich Milk Chocolate Cocoa violates the Sherman Law and is therefore misbranded.

194.   A copy of the label of Nestlé Rich Milk Chocolate Cocoa is attached as Exhibit 5.

195.   The label on the package of Nestlé Rich Milk Chocolate Cocoa purchased by Plaintiff Belli states "*Antioxidants help to protect cells from damage and calcium helps to build strong bones.*"   All packages of Nestlé Rich Milk Chocolate Cocoa sold in the Class Period have the same statement.

196.   A health claim is a statement expressly or implicitly linking the consumption of a food substance (*e.g.*, ingredient, nutrient, or complete food) to risk of a disease (*e.g.*, cardiovascular disease) or a health-related condition (*e.g.*, hypertension). *See* 21 C.F.R. § 101.14(a)(1), (a)(2), and (a)(5). Only health claims made in accordance with FDCA requirements, or authorized by FDA as qualified health claims, may be included in food labeling. Other express or implied statements that constitute health claims, but that does not meet statutory requirements, are prohibited in labeling foods.

197.   21 C.F.R. § 101.14, which has been expressly adopted by California, provides when and how a manufacturer may make a health claim about its product.  A "Health Claim" means any claim made on the label or in labeling of a food, including a dietary supplement, that

1    expressly or by implication, including "third party" references, written statements (*e.g.*, a brand

2    name including a term such as "heart"), symbols (*e.g.*, a heart symbol), or vignettes, characterizes

3    the relationship of any substance to a disease or health-related condition. Implied health claims

4    include those statements, symbols, vignettes, or other forms of communication that suggest,

5    within the context in which they are presented, that a relationship exists between the presence or

6    level of a substance in the food and a disease or health-related condition (*see* 21 CFR §

7    101.14(a)(1)).

8           198.    21 CFR § 101.14(e) prohibits any health claims from being made if disqualifying

9    levels of nutrients are present. 21 CFR § 101.14(a)(4) specifies that ["d]isqualifying nutrient

10   levels means the levels of total fat, saturated fat, cholesterol, or sodium in a food above which the

11   food will be disqualified from making a health claim. These levels are 13.0 grams (g) of fat, 4.0 g

12   of saturated fat, 60 milligrams (mg) of cholesterol, or 480 mg of sodium, per reference amount

13   customarily consumed, per label serving size, and, only for foods with reference amounts

14   customarily consumed of 30 g or less or 2 tablespoons or less, per 50 g." The Defendant's Nestlé

15   Rich Milk Chocolate Cocoa made the specified health claims despite having a disqualifying

16   nutrient levels.

17          199.    Further, health claims are limited to claims about disease risk reduction, and

18   cannot be claims about the diagnosis, cure, mitigation, or treatment of disease. An example of an

19   authorized health claim is: "Three grams of soluble fiber from oatmeal daily in a diet low in

20   saturated fat and cholesterol may reduce the risk of heart disease. This cereal has 2 grams per

21   serving."

22          200.    A claim that a substance may be used in the diagnosis, cure, mitigation, treatment,

23   or prevention of a disease is a drug claim and may not be made for a food. 21 U.S.C. §

24   321(g)(1)(D).

25          201.    Defendant violated California Health & Safety Code § 110403 which prohibits the

26   advertisement of products that are represented to have any effect  on enumerated conditions,

27   disorders and diseases including cancer and heart diseases unless the materials have federal

28   approval.

202.   The therapeutic claims on Defendant's labeling establish that Defendant's products are drugs because they are intended for use in the cure, mitigation, treatment, or prevention of disease. Defendant's products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products would be "new drug[s]" under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally marketed in the U.S. without prior approval from the FDA as described in section 505(a) of the Act [21 U.S.C. § 355(a)]. FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective.

203.   Defendant's materials and advertisements not only violate regulations adopted by California such as 21 C.F.R. § 101.14,  they also violate California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect  on enumerated conditions, disorders and diseases including heart disease unless the materials have federal approval.

204.   Defendant's violations of the Sherman Law include Defendant's illegal labeling practices which misbrand the Nestlé Rich Milk Chocolate Cocoa as well as the illegal advertising, marketing, distribution, delivery and sale of Defendant's misbranded Nestlé Rich Milk Chocolate Cocoa to consumers in California and throughout the United States.

205.   As a result, consumers, including Plaintiff Belli and the Class, bought products that fail to comply with the mandatory labeling requirements and standards established by law such that the products are misbranded and rendered unfit for sale.

206.   Plaintiff Belli and the Class have been damaged by Defendant's illegal conduct in that they purchased misbranded and worthless products that were illegal to sell or possess based on Defendant's illegal labeling of the products and otherwise lost money.

207.   Plaintiff Belli reasonably relied on the omission of fact/misrepresentation that Defendant's Nestlé Rich Milk Chocolate Cocoa were not misbranded under the Sherman Law and were therefore legal to buy and possess. However, reliance is not required to prove a claim under the unlawful prong of the UCL or the CLRA. Plaintiff Belli would not have purchased Nestlé Rich Milk Chocolate Cocoa had she known it was illegal to purchase and possess.

208.    Because of the violations of 21 C.F.R. § 101.60 and Sherman Law § 110100,

Defendant's products are misbranded under Sherman Law § 110660, Sherman Law § 110670 and

Sherman Law § 110705. Defendant's act of selling a misbranded product violates Sherman Law §

110760 which prohibits the sale or possession of misbranded products.

209.    Defendant's sale of its misbranded Nestlé Rich Milk Chocolate Cocoa results in an

independent violation of the unlawful prong that is separate from the labeling violation.

Defendant committed two separate illegal acts that give rise to claims under the unlawful prong.

The first arises from Defendant's label statement on its Nestlé Rich Milk Chocolate Cocoa. When

Plaintiff Belli relied on these claims to her detriment when purchasing Defendant's Nestlé Rich

Milk Chocolate Cocoa she was injured and therefore has a claim arising from her purchase of a

product in reliance on the illegal labeling claim made by Defendant.

210.    The second is arising when Defendant sold an illegal product in an unlawful sale.

The only necessary element of this latter claim is Defendant's sale of a misbranded product that

injured Plaintiff Belli whose injury arises from the unlawful sale of an illegal product that is

unlawful to sell and unlawful to possess. No reliance by the consumer is necessary. Plaintiff Belli

has been deprived of money in an illegal sale and given a worthless illegal product in return. In

addition, due to the law's prohibition of possession of such a product, Plaintiff Belli has been

unwittingly placed by the Defendant's conduct in a legal position that no reasonable consumer

would agree to be placed.

### 2.    The Statement "*Antioxidants Help To Protect Cells From Damage and Calcium Helps To Build Strong Bones*" on Nestlé Rich Milk Chocolate Cocoa Is Misleading and Deceptive

211.    Plaintiff Belli read and relied upon Defendant's label statement "*Antioxidants Help To Protect Cells From Damage and Calcium Helps To Build Strong Bones*" and Plaintiff Belli was thus deceived.

212.    Plaintiff Belli and members of the class were misled into the belief that such claims were legal and had passed regulatory muster and were supported by science capable of securing regulatory acceptance. Because this was not the case, Plaintiff Belli and members of the class have been deceived.

213.    Plaintiff Belli was misled to believe that the product was healthier than other similar products by that did not have a similar statement.

214.    Defendant's conduct misled Plaintiff Belli because Defendant's product was purported to be a healthier choice than other similar products. Plaintiff Belli is conscious of the healthiness of the products she purchases, and Defendant's unlawful statement deprived Plaintiff Belli of her ability to take into account those foods' contributions, or not, to Plaintiff Belli's total dietary composition. Plaintiff Belli was misled by the Defendant's unlawfully prominent display of the ostensible good traits of its product, and unlawful failure to disclose the bad.

215.    Plaintiff Belli reasonably relied on the label representation when making her purchase decisions and was misled representation as described herein.

216.    Plaintiff Belli would not have purchased this product had she known the truth about these product, i.e. that the product was not "healthier" than other similar products and that it contained disqualifying levels of unhealthy nutrients that precluded the Defendant from making a health claim about these products.  Plaintiff Belli had other food alternatives that satisfied such standards and Plaintiff Belli also had cheaper alternatives.  Reasonable consumers would have been misled in the same identical manner as Plaintiff Belli.

**F.**    **Nestlé Nesquik Chocolate Syrup**

217.    Plaintiff Belli purchased Nestlé Nesquik Chocolate Syrup during the Class Period.

218.    For purposes of this case, there are no Substantially Similar Products to Nestlé Nesquik Chocolate Syrup.

**1.**    **The Nestlé Nesquik Chocolate Syrup Is Misbranded Under the Sherman Law**

219.    The label on the package of Nestlé Nesquik Chocolate Syrup violates the Sherman Law and is therefore misbranded.

220.    A copy of the label of Nestlé Nesquik Chocolate Syrup purchased by Plaintiff Belli is attached as Exhibit 6.

221.    The label on the package of Nestlé Nesquik Chocolate Syrup purchased by Plaintiff Belli states "Serving Size 1 tbsp (20g).  All packages of Nestlé Nesquik Chocolate Syrup

1    sold in the Class Period have the same statement.

2           222.    In violation of identical California and federal law, Defendant has utilized

3    unlawful and misleading serving sizes to understate the caloric value of its Nestlé Nesquik

4    Chocolate Syrup.

5           223.    21 C.F.R. § 101.12, which has been adopted by California, lists the reference

6    amounts that shall be used to determine serving sizes for specific products.  The FDA explained

7    these serving size references in its lists of categories and products at

8    http://www.fda.gov/ICECI/Inspections/InspectionGuides/ucm114704.htm.

9           224.    Table 2 of 21 C.F.R. § 101.12 states the reference amount for syrups is 35 grams

10   (2 tbsp).

11          225.    Defendant violates this rule in that Defendant understates the serving size of its

12   products in order to mislead consumers into believing there are fewer calories, sugar grams, fat

13   contents, etc. in these products.

14          226.    The label of Defendant's Nesquik Chocolate Syrup states that a serving size is 1

15   tbsp (20g).  This understates the ingredients within this product by 50%.  Defendant's Nesquik

16   Chocolate Syrup is a syrup under California and federal law.

17          227.    By utilizing a smaller incorrect serving size the Defendant understated calories,

18   carbohydrates and sugars. This is misleading to consumers such as Plaintiff Belli who rely on the

19   nutritional facts table and the information contained therein.

20          228.    Defendant is in violation despite numerous enforcement actions and warning

21   letters pertaining to several other companies addressing the type of misleading serving size

22   statements described herein.

23          229.    Because of these unlawful and misleading serving size statements and nutritional

24   information on which they relied, Plaintiff and members of the class purchased these products and

25   paid a premium for them.  The serving size regulations discussed herein are intended to ensure

26   that consumers are not misled as to the actual or relative levels of nutrients in food products.

27   Defendant has violated these referenced regulations.

28          230.    Defendant's violations of the Sherman Law include Defendant's illegal labeling

1  practices which misbrand the Nestlé Nesquik Chocolate Syrup as well as the illegal advertising,

2  marketing, distribution, delivery and sale of Defendant's misbranded Nestlé Nesquik Chocolate

3  Syrup to consumers in California and throughout the United States.

4      231.    As a result, consumers, including Plaintiff Belli and the Class, bought products

5  that fail to comply with the mandatory labeling requirements and standards established by law

6  such that the products are misbranded and rendered unfit for sale.

7      232.    Plaintiff Belli and the Class have been damaged by Defendant's illegal conduct in

8  that they purchased misbranded and worthless products that were illegal to sell or possess based

9  on Defendant's illegal labeling of the products and otherwise lost money.

10     233.    Plaintiff Belli reasonably relied on the omission of fact/misrepresentation that

11  Defendant's Nestlé Nesquik Chocolate Syrup were not misbranded under the Sherman Law and

12  were therefore legal to buy and possess. However, reliance is not required to prove a claim under

13  the unlawful prong of the UCL or the CLRA. Plaintiff Belli would not have purchased Nestlé

14  Nesquik Chocolate Syrup had she known they were illegal to purchase and possess.

15     234.    Defendant's Nestlé Nesquik Chocolate Syrup is misbranded under Sherman Law §

16  110660, Sherman Law § 110670 and Sherman Law § 110705. Defendant's act of selling a

17  misbranded product violates Sherman Law § 110760 which prohibits the sale or possession of

18  misbranded products.

19     235.    Defendant's sale of these misbranded Nestlé Nesquik Chocolate Syrup results in

20  an independent violation of the unlawful prong that is separate from the labeling violation.

21  Defendant committed two separate illegal acts that give rise to claims under the unlawful prong.

22  The first arises from Defendant's unlawful serving size label statements on its Nestlé Nesquik

23  Chocolate Syrup. When Plaintiff Belli relied on these claims to her detriment when purchasing

24  Defendant's Nestlé Nesquik Chocolate Syrup she was injured and therefore has a claim arising

25  from her purchase of a product in reliance on the illegal labeling claims made by Defendant.

26     236.    The second is arising when Defendant sold an illegal product in an unlawful sale.

27  The only necessary element of this latter claim is Defendant's sale of a misbranded product that

28  injured Plaintiff Belli whose injury arises from the unlawful sale of an illegal product that is

1  unlawful to sell and unlawful to possess. No reliance by the consumer is necessary. Plaintiff Belli

2  has been deprived of money in an illegal sale and given a worthless illegal product in return. In

3  addition, due to the law's prohibition of possession of such a product, Plaintiff Belli has been

4  unwittingly placed by the Defendant's conduct in a legal position that no reasonable consumer

5  would agree to be placed.

6              **2.      The "Serving Size 1 tbsp (20g)" Label Statement on Nestlé Eskimo Pie**
             **Dark Chocolate Is Misleading and Deceptive**
7

8  237.    Plaintiff Belli read and relied upon Defendant's front of package "Serving Size 1

9  tbsp (20g)" label statement on Nestlé Nesquik Chocolate Syrup and Plaintiff was thus deceived.

10  238.    The label of Defendant's Nesquik Chocolate Syrup states that a serving size is 1

11  tbsp (20g).  This understates the ingredients within this product by 50%.  Consequently, a

12  consumer would believe such a product would be healthier than other similar products because

13  the number of calories would seem to be less.

14  239.    By utilizing a smaller incorrect serving size on the Nestlé Nesquik Chocolate

15  Syrup Defendant understated calories, carbohydrates and sugars. This is misleading to Plaintiff

16  Belli and other reasonable consumers who rely on the nutritional facts table and the information

17  contained therein.

18  240.    Defendant is in violation despite numerous enforcement actions and warning

19  letters pertaining to several other companies addressing the type of misleading serving size

20  statements described herein.

21  241.    Because of these unlawful and misleading serving size statements and nutritional

22  information on which they relied, Plaintiff Belli and members of the class purchased these

23  products and paid a premium for them.  The serving size regulations discussed herein are

24  intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in

25  food products.  Defendant has violated these referenced regulations.

26  242.    Plaintiff Belli was misled to believe that the product was healthier than other

27  similar products by that did not have a similar statement.

28

243.    Defendant's conduct misled Plaintiff Belli because Defendant's product was purported to be a healthier choice than other similar products. Plaintiff Belli is conscious of the healthiness of the products she purchases, and Defendant's unlawful statement deprived Plaintiff Belli of her ability to take into account those foods' contributions, or not, to Plaintiff Belli's total dietary composition. Plaintiff Belli was misled by the Defendant's unlawfully prominent display of the ostensible good traits of its product, and unlawful failure to disclose the bad.

244.    Plaintiff Belli reasonably relied on the label representation when making her purchase decisions and was misled representation as described herein.

245.    Plaintiff Belli would not have purchased this product had she known the truth about these product, i.e. that the product was not "healthier" than other similar products.  Plaintiff Belli had other food alternatives that satisfied such standards and Plaintiff Belli also had cheaper alternatives.  Reasonable consumers would have been misled in the same identical manner as Plaintiff Belli.

**G.      Buitoni Alfredo Sauce**

246.    Plaintiff Belli purchased Buitoni Alfredo Sauce during the Class Period.

247.    For purposes of this case, there are no Substantially Similar Products to Buitoni Alfredo Sauce.

**1.      The Buitoni Alfredo Sauce Is Misbranded Under the Sherman Law**

248.    The label on the package of Buitoni Alfredo Sauce violates the Sherman Law and is therefore misbranded.

249.    A copy of the label of Buitoni Alfredo Sauce purchased by Plaintiff Belli is attached as Exhibit 7.

250.    In violation of identical California and federal law, Defendant has utilized unlawful and misleading serving sizes to understate the caloric value of its Buitoni Alfredo Sauce.

251.    21 C.F.R. § 101.12, which has been adopted by California, lists the reference amounts that shall be used to determine serving sizes for specific products.  The FDA explained these serving size references in its lists of categories and products at http://www.fda.gov/ICECI/Inspections/InspectionGuides/ucm114704.htm.

252.     Table 2 of 21 C.F.R. § 101.12 states the reference amount for syrups is 35 grams (2 tbsp) and for main entrée sauces is 125 grams.  Buitoni Alfredo Sauce is a main entrée sauces under California and federal law.  The label on the package of Buitoni Alfredo Sauce purchased by Plaintiff Belli states "Serv. Size ¼ cup (61g)."  All packages of Buitoni Alfredo Sauce sold in the Class Period have the same statement.  This understates the ingredients within this product by 50%.

253.     Defendant violates this rule in that Defendant understates the serving size of its products in order to mislead consumers into believing there are fewer calories, sugar grams, fat contents, etc. in these products.

254.     By utilizing a smaller incorrect serving size the Defendant understated calories, carbohydrates and sugars. This is misleading to consumers such as Plaintiff Belli who rely on the nutritional facts table and the information contained therein.

255.     Defendant is in violation despite numerous enforcement actions and warning letters pertaining to several other companies addressing the type of misleading serving size statements described herein.

256.     Because of these unlawful and misleading serving size statements and nutritional information on which they relied, Plaintiff Belli and members of the class purchased these products and paid a premium for them.  The serving size regulations discussed herein are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products.  Defendant has violated these referenced regulations.

257.     Defendant's violations of the Sherman Law include Defendant's illegal labeling practices which misbrand the Buitoni Alfredo Sauce as well as the illegal advertising, marketing, distribution, delivery and sale of Defendant's misbranded Buitoni Alfredo Sauce to consumers in California and throughout the United States.

258.     As a result, consumers, including Plaintiff Belli and the Class, bought products that fail to comply with the mandatory labeling requirements and standards established by law such that the products are misbranded and rendered unfit for sale.

259.     Plaintiff Belli and the Class have been damaged by Defendant's illegal conduct in

that they purchased misbranded and worthless products that were illegal to sell or possess based on Defendant's illegal labeling of the products and otherwise lost money.

260.    Plaintiff Belli reasonably relied on the omission of fact/misrepresentation that Defendant's Buitoni Alfredo Sauce were not misbranded under the Sherman Law and were therefore legal to buy and possess. However, reliance is not required to prove a claim under the unlawful prong of the UCL or the CLRA. Plaintiff Belli would not have purchased Buitoni Alfredo Sauce had she known they were illegal to purchase and possess.

261.    Defendant's Buitoni Alfredo Sauce is misbranded under Sherman Law § 110660, Sherman Law § 110670 and Sherman Law § 110705. Defendant's act of selling a misbranded product violates Sherman Law § 110760 which prohibits the sale or possession of misbranded products.

262.    Defendant's sale of these misbranded Buitoni Alfredo Sauce results in an independent violation of the unlawful prong that is separate from the labeling violation. Defendant committed two separate illegal acts that give rise to claims under the unlawful prong. The first arises from Defendant's unlawful serving size label statements on its Buitoni Alfredo Sauce. When Plaintiff Belli relied on these claims to her detriment when purchasing Defendant's Buitoni Alfredo Sauce she was injured and therefore has a claim arising from her purchase of a product in reliance on the illegal labeling claims made by Defendant.

263.    The second is arising when Defendant sold an illegal product in an unlawful sale. The only necessary element of this latter claim is Defendant's sale of a misbranded product that injured Plaintiff Belli whose injury arises from the unlawful sale of an illegal product that is unlawful to sell and unlawful to possess. No reliance by the consumer is necessary. Plaintiff Belli has been deprived of money in an illegal sale and given a worthless illegal product in return. In addition, due to the law's prohibition of possession of such a product, Plaintiff Belli has been unwittingly placed by the Defendant's conduct in a legal position that no reasonable consumer would agree to be placed.

### 2. The "Serv. Size ¼ cup (61g)" Label Statement on Buitoni Alfredo Sauce Is Misleading and Deceptive

264. Plaintiff Belli read and relied upon Defendant's front of package "Serv. Size ¼ cup (61g)" label statement on Buitoni Alfredo Sauce and Plaintiff was thus deceived.

265. The label of Defendant's Buitoni Alfredo Sauce states that a serving size is 61g. This understates the ingredients within this product by 50%. Consequently, a consumer would believe such a product would be healthier than other similar products because the number of calories would seem to be less.

266. By utilizing a smaller incorrect serving size on the Buitoni Alfredo Sauce Defendant understated calories, carbohydrates and sugars. This is misleading to Plaintiff Belli and other reasonable consumers who rely on the nutritional facts table and the information contained therein.

267. Defendant is in violation despite numerous enforcement actions and warning letters pertaining to several other companies addressing the type of misleading serving size statements described herein.

268. Because of these unlawful and misleading serving size statements and nutritional information on which they relied, Plaintiff Belli and members of the class purchased these products and paid a premium for them. The serving size regulations discussed herein are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products. Defendant has violated these referenced regulations.

269. Plaintiff Belli was misled to believe that the product was healthier than other similar products by that did not have a similar statement.

270. Defendant's conduct misled Plaintiff Belli because Defendant's product was purported to be a healthier choice than other similar products. Plaintiff Belli is conscious of the healthiness of the products she purchases, and Defendant's unlawful statement deprived Plaintiff Belli of her ability to take into account those foods' contributions, or not, to Plaintiff Belli's total dietary composition. Plaintiff Belli was misled by the Defendant's unlawfully prominent display of the ostensible good traits of its product, and unlawful failure to disclose the bad.

271.    Plaintiff Belli reasonably relied on the label representation when making her purchase decisions and was misled representation as described herein.

272.    Plaintiff Belli would not have purchased this product had she known the truth about these product, i.e. that the product was not "healthier" than other similar products.  Plaintiff Belli had other food alternatives that satisfied such standards and Plaintiff Belli also had cheaper alternatives.  Reasonable consumers would have been misled in the same identical manner as Plaintiff Belli.

## PLAINTIFFS AND THE PURCHASED PRODUCTS

273.    Plaintiffs care about the nutritional content of food and seek to maintain a healthy diet.

274.    During the Class Period, Plaintiffs spent more than $25.00 on the Purchased Products.

275.    Plaintiffs read and reasonably relied on the labels as described herein when buying the Purchased Products.  Plaintiffs relied on Defendant's labeling and based and justified the decision to purchase Defendant's products, in substantial part, on these labels.

276.    At point of sale, Plaintiffs did not know, and had no reason to know, the truth about the Purchased Products as described herein, and the fact the Purchased Products were misbranded as set forth herein.  Plaintiffs would not have bought the products had they known the truth about them.

277.    After Plaintiffs learned that Defendant's Purchased Products were falsely labeled, Plaintiffs stopped purchasing them.

278.    As a result of Defendant's actions, Plaintiffs and thousands of others in California and throughout the United States purchased the Purchased Products.

279.    Defendant's labeling as alleged herein is false and misleading and was designed to increase sales of the products at issue.  Defendant's misrepresentations are part of its systematic labeling practice and a reasonable person would attach importance to Defendant's misrepresentations in determining whether to buy the Purchased Products.

280.     A reasonable person would also attach importance to whether Defendant's products were "misbranded," *i.e.*, legally salable, and capable of legal possession, and to Defendant's representations about these issues in determining whether to purchase the products at issue. Plaintiffs would not have purchased Defendant's products had she known they were not capable of being legally sold or held.

281.     Plaintiffs had cheaper alternatives available and paid an unwarranted premium for the Purchased Products.

## DEFENDANT HAS VIOLATED CALIFORNIA LAW

282.     Defendant has violated California Health & Safety Code § 110390 which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product.

283.     Defendant has violated California Health & Safety Code § 110395 which makes it unlawful to manufacture, sell, deliver, hold, sell or offer to sell any falsely advertised food.

284.     Defendant has violated California Health & Safety Code §§ 110398 and 110400 which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely advertised.

285.     Defendant has violated California Health & Safety Code § 110660 because its labeling is false and misleading in one or more ways, as follows:

a.     Defendant's Purchased Products are misbranded under California Health & Safety Code § 110665 because its labeling fails to conform to the requiremepnts for nutrient labeling set forth in 21 U.S.C. § 343(q) and the regulations adopted thereto;

b.     Defendant's Purchased Products are misbranded under California Health & Safety Code § 110670 because its labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and the regulations adopted thereto; and

c.     Defendant's Purchased Products are misbranded under California Health & Safety Code § 110705 because words, statements and other information required by the Sherman Law to appear on its labeling either are missing or not sufficiently conspicuous.

286. Defendant has violated California Health & Safety Code § 110760 which makes it unlawful for any person to manufacture, advertise, distribute, hold, sell or offer for sale, any food that is misbranded.

287. Defendant has violated California Health & Safety Code § 110765 which makes it unlawful for any person to misbrand any food.

288. Defendant has violated California Health & Safety Code § 110770 which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for deliver any such food.

## CLASS ACTION ALLEGATIONS

289. Plaintiffs bring this action as a class action pursuant to Federal Rule of Procedure 23(b)(2) and 23(b)(3) on behalf of the following "class:"

All persons in the United States since May 4, 2008 who purchased one of the following products:

Nestlé Eskimo Pie Dark Chocolate
Nestlé Juicy Juice (Apple)
Nestlé Juicy Juice (Apple Raspberry)
Nestlé Juicy Juice (Berry)
Nestlé Juicy Juice (Cherry)
Nestlé Juicy Juice (Grape)
Nestlé Juicy Juice (Kiwi Strawberry)
Nestlé Juicy Juice (Mango)
Nestlé Juicy Juice (Orange Tangerine)
Nestlé Juicy Juice (Fruit Punch)
Nestlé Juicy Juice (Strawberry Banana)
Nestlé Juicy Juice (Tropical)
Nestlé Juicy Juice (White Grape)
Dreyer's "All Natural" Fruit Bars (Strawberry)
Dreyer's "All Natural" Fruit Bars (Lemonade)
Dreyer's "All Natural" Fruit Bars (Lime)
Dreyer's "All Natural" Fruit Bars (Coconut)
Dreyer's "All Natural" Fruit Bars (Grape)
Dreyer's "All Natural" Fruit Bars (Tangerine)
Dreyer's "All Natural" Fruit Bars (Blueberry Acai)
Dreyer's "All Natural" Fruit Bars (Pomegranate)
Edy's "All Natural" Fruit Bars (Lemonade)
Edy's "All Natural" Fruit Bars (Lime)
Edy's "All Natural" Fruit Bars (Strawberry)
Edy's "All Natural" Fruit Bars (Coconut)
Edy's "All Natural" Fruit Bars (Grape)
Edy's "All Natural" Fruit Bars (Tangerine)
Edy's "All Natural" Fruit Bars (Blueberry Acai)
Nestlé Coffee Mate Powder (Original)
Nestlé Coffee Mate Powder (Hazelnut)

Nestlé Coffee Mate Powder (Vanilla Caramel)
Nestlé Coffee Mate Powder (Creamy Chocolate
Nestlé Coffee Mate Powder (French Vanilla)
Sugar Free Nestlé Coffee Mate Powder (Hazelnut)
Sugar Free Nestlé Coffee Mate Powder (Vanilla Caramel)
Sugar Free Nestlé Coffee Mate Powder (French Vanilla)
Nestlé Rich Milk Chocolate Cocoa
Nestlé Mini Marshmallows Cocoa
Nestlé Dark Chocolate Cocoa
Nestlé Chocolate Caramel Cocoa
Nestlé Chocolate Mint Cocoa
Nestlé Women's Wellness Cocoa
Nestlé No Sugar Added Cocoa
Nestlé Fat Free Cocoa
Nestlé Nesquik Chocolate Syrup
Buitoni Alfredo Sauce

290.    Alternatively, Plaintiffs propose six separate classes each comprising of a Purchased Product plus any Substantially Similar Product, if any, in the Class Period.

291.    The products listed in the class are referred to as the "Class Products."

292.    The following persons are expressly excluded from the class:  (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

293.    This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

294.    <u>Numerosity</u>:  Based upon Defendant's publicly available sales data with respect to the misbranded products at issue, it is estimated that the class numbers in the thousands and that joinder of all class members is impracticable.

295.    <u>Common Questions Predominate</u>:  This action involves common questions of law and fact applicable to each class member that predominate over questions that affect only individual class members.  Thus, proof of a common set of facts will establish the right of each class member to recover.  Questions of law and fact common to each class member include, just for example:

a.    Whether the Class Products are misbranded under the Sherman Law;

b.    Whether Defendants violated the Sherman Law;

c.   Whether Defendant made unlawful and/or misleading claims with respect to its Class Products sold to consumers;

d.   Whether Defendant engaged in unlawful and misleading, unfair or deceptive business practices by failing to properly package and label its Class Products sold to consumers;

e.   Whether Defendant violated California Bus. & Prof. Code § 17200 *et seq.*, California Bus. & Prof. Code § 17500 *et seq.*, the Consumers Legal Remedies Act, Cal. Civ. Code §1750 *et seq.*, and the Sherman Law;

f.   Whether Plaintiffs and the class are entitled to equitable and/or injunctive relief; and

g.   Whether Defendant's unlawful and misleading, unfair and/or deceptive practices harmed Plaintiffs and the class.

266.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the class because Plaintiffs bought Defendant's Class Products during the Class Period.  Defendant's unlawful, misleading, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Plaintiffs and the class sustained similar injuries arising out of Defendant's conduct in violation of California law.  The injuries of each member of the class were caused directly by Defendant's wrongful conduct.  In addition, the factual underpinning of Defendant's misconduct is common to all class members and represents a common thread of misconduct resulting in injury to all members of the class.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the class members and are based on the same legal theories.

267.   <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the class. Neither Plaintiffs nor Plaintiffs' Counsel have any interests that conflict with or are antagonistic to the interests of the class members.  Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the members of the class.  Plaintiffs and Plaintiffs' counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the class.

268.   <u>Superiority</u>:  There is no plain, speedy or adequate remedy other than by

1    maintenance of this class action.  The prosecution of individual remedies by members of the class

2    will tend to establish inconsistent standards of conduct for Defendant and result in the impairment

3    of class members' rights and the disposition of its interests through actions to which they were

4    not parties.  Class action treatment will permit a large number of similarly situated persons to

5    prosecute their common claims in a single forum simultaneously, efficiently and without the

6    unnecessary duplication of effort and expense that numerous individual actions would engender.

7    Further, as the damages suffered by individual members of the class may be relatively small, the

8    expense and burden of individual litigation would make it difficult or impossible for individual

9    members of the class to redress the wrongs done to them, while an important public interest will

10   be served by addressing the matter as a class action.  Class treatment of common questions of law

11   and fact would also be superior to multiple individual actions or piecemeal litigation in that class

12   treatment will conserve the resources of the Court and the litigants, and will promote consistency

13   and efficiency of adjudication.

14           269.    The prerequisites to maintaining a class action for injunctive or equitable relief

15   pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds

16   generally applicable to the class, thereby making appropriate final injunctive or equitable relief

17   with respect to the class as a whole.

18           270.    The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3)

19   are met as questions of law or fact common to class members predominate over any questions

20   affecting only individual members, and a class action is superior to other available methods for

21   fairly and efficiently adjudicating the controversy.

22           271.    Plaintiffs and Plaintiffs' counsel are unaware of any difficulties that are likely to

23   be encountered in the management of this action that would preclude its maintenance as a class

24   action.

25                                    **CAUSES OF ACTION**

26                                    **FIRST CAUSE OF ACTION**

27   **Business and Professions Code § 17200 *et seq*. - Unlawful Business Acts and Practices**

28           272.    Plaintiffs incorporate by reference each allegation set forth above.

273.   Defendant's conduct constitutes unlawful business acts and practices.

274.   Defendant sold Class Products in California and the United States during the Class Period.

275.   Defendant is a corporation and, therefore, is a "person" within the meaning of the Sherman Law.

276.   Defendant's business practices are unlawful under § 17200 *et seq.* by virtue of Defendant's violations of the advertising provisions of Article 3 of the Sherman Law and the misbranded food provisions of Article 6 of the Sherman Law.

277.   Defendant's business practices are unlawful under § 17200 *et seq.* by virtue of Defendant's violations of § 17500 *et seq.*, which forbids untrue and misleading advertising.

278.   Defendant's business practices are unlawful under § 17200 *et seq.* by virtue of Defendant's violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*

279.   Defendant sold Plaintiffs and the class Purchased Products that were not capable of being sold or held legally and which were legally worthless.

280.   As a result of Defendant's illegal business practices, Plaintiffs and the class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and to restore to any class member any money paid for the Purchased Products.

281.   Defendant's unlawful business acts present a threat and reasonable continued likelihood of injury to Plaintiffs and the class.  Plaintiffs and the class paid a premium price for the Purchased Products.

282.   As a result of Defendant's conduct, Plaintiffs and the class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Class Products by Plaintiffs and the class.

**SECOND CAUSE OF ACTION**

**Business and Professions Code § 17200 *et seq*. - Unfair Business Acts and Practices**

283.    Plaintiffs incorporate by reference each allegation set forth above.

284.    Defendant's conduct as set forth herein constitutes unfair business acts and practices.

285.    Defendant sold Class Products in California and the United States during the Class Period.

286.    Plaintiffs and members of the class suffered a substantial injury by virtue of buying Defendant's Class Products that they would not have purchased absent Defendant's illegal conduct.

287.    Defendant's deceptive marketing, advertising, packaging and labeling of its Class Products and its sale of unsalable misbranded products that were illegal to possess was of no benefit to consumers, and the harm to consumers and competition is substantial.

288.    Defendant sold Plaintiffs and the class products that were not capable of being legally sold or held and that were legally worthless.

289.    Plaintiffs and the class who purchased Defendant's Class Products had no way of reasonably knowing that the products were misbranded and were not properly  marketed, advertised, packaged and labeled, and thus could not have reasonably avoided the injury each of them suffered.

290.    The consequences of Defendant's conduct as set forth herein outweigh any justification, motive or reason therefore.  Defendant's conduct is and continues to be immoral, unethical, unscrupulous, contrary to public policy, and is substantially injurious to Plaintiffs and the class.  Plaintiffs and the class paid a premium price for the Purchased Products.

291.    As a result of Defendant's conduct, Plaintiffs and the class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Class Products by Plaintiffs and the class.

**THIRD CAUSE OF ACTION**

**Business and Professions Code § 17200 *et seq*. - Fraudulent Business Acts and Practices**

292.    Plaintiffs incorporate by reference each allegation set forth above.

293.    Defendant's conduct as set forth herein constitutes fraudulent business practices under California Business and Professions Code sections § 17200 *et seq*.

294.    Defendant sold Class Products in California and the United States during the Class Period.

295.    Defendant's misleading marketing, advertising, packaging and labeling of the Purchased Products and misrepresentation that the products were salable, capable of possession and not misbranded were likely to deceive reasonable consumers, and in fact, Plaintiffs and members of the class were deceived.  Defendant has engaged in fraudulent business acts and practices.

296.    Defendant's fraud and deception caused Plaintiffs and the class to purchase Defendant's Class Products that they would otherwise not have purchased had they known the true nature of those products.

297.    Defendant sold Plaintiffs and the class Class Products that were not capable of being sold or held legally and that were legally worthless.  Plaintiffs and the class paid a premium price for the Class Products.

298.    As a result of Defendant's conduct as set forth herein, Plaintiffs and the class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Class Products by Plaintiffs and the class.

**FOURTH CAUSE OF ACTION**

**Business and Professions Code § 17500 *et seq*. - Misleading and Deceptive Advertising**

299.    Plaintiffs incorporate by reference each allegation set forth above.

300.    Plaintiffs assert this cause of action for violations of California Business and Professions Code § 17500 *et seq*. for misleading and deceptive advertising against Defendant.

1   301.   Defendant sold Class Products in California and the United States during the Class

2   Period.

3   302.   Defendant engaged in a scheme of offering Defendant's Class Products for sale to

4   Plaintiffs and members of the class by way of, *inter alia*, product packaging and labeling, and

5   other promotional materials.  These materials misrepresented and/or omitted the true contents and

6   nature of Defendant's Class Products.  Defendant's advertisements and inducements were made

7   within California and come within the definition of advertising as contained in Business and

8   Professions Code §17500 *et seq.* in that such product packaging and labeling, and promotional

9   materials were intended as inducements to purchase Defendant's Class Products and are

10  statements disseminated by Defendant to Plaintiffs and the class that were intended to reach

11  members of the class.  Defendant knew, or in the exercise of reasonable care should have known,

12  that these statements were misleading and deceptive as set forth herein.

13  303.   In furtherance of its plan and scheme, Defendant prepared and distributed within

14  California and nationwide via product packaging and labeling, and other promotional materials,

15  statements that misleadingly and deceptively represented the composition and the nature of

16  Defendant's Class Products.  Plaintiffs and the class necessarily and reasonably relied on

17  Defendant's materials, and were the intended targets of such representations.

18  304.   Defendant's conduct in disseminating misleading and deceptive statements in

19  California and nationwide to Plaintiffs and the class was and is likely to deceive reasonable

20  consumers by obfuscating the true composition and nature of Defendant's Class Products in

21  violation of the "misleading prong" of California Business and Professions Code § 17500 *et seq.*

22  305.   As a result of Defendant's violations of the "misleading prong" of California

23  Business and Professions Code § 17500 *et seq.*, Defendant has been unjustly enriched at the

24  expense of Plaintiffs and the class.  Misbranded products cannot be legally sold or held and are

25  legally worthless.  Plaintiffs and the class paid a premium price for the Class Products.

26  306.   Plaintiffs and the class, pursuant to Business and Professions Code § 17535, are

27  entitled to an order enjoining such future conduct by Defendant, and such other orders and

28  judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any

money paid for Defendant's Class Products by Plaintiffs and the class.

## FIFTH CAUSE OF ACTION

### Business and Professions Code § 17500 *et seq*. - Untrue Advertising

307.    Plaintiffs incorporate by reference each allegation set forth above.

308.    Plaintiffs assert this cause of action against Defendant for violations of California Business and Professions Code § 17500 *et seq.*, regarding untrue advertising.

309.    Defendant sold Class Products in California and the United States during the Class Period.

310.    Defendant engaged in a scheme of offering Defendant's Class Products for sale to Plaintiffs and the class by way of product packaging and labeling, and other promotional materials.  These materials misrepresented and/or omitted the true contents and nature of Defendant's Class Products.  Defendant's advertisements and inducements were made in California and come within the definition of advertising as contained in Business and Professions Code §17500 *et seq.* in that the product packaging and labeling, and promotional materials were intended as inducements to purchase Defendant's Class Products, and are statements disseminated by Defendant to Plaintiffs and the class.  Defendant knew, or in the exercise of reasonable care should have known, that these statements were untrue.

311.    In furtherance of its plan and scheme, Defendant prepared and distributed in California and nationwide via product packaging and labeling, and other promotional materials, statements that falsely advertise the composition of Defendant's Class Products, and falsely misrepresented the nature of those products.  Plaintiffs and the class were the intended targets of such representations and would reasonably be deceived by Defendant's materials.

312.    Defendant's conduct in disseminating untrue advertising throughout California deceived Plaintiffs and members of the class by obfuscating the contents, nature and quality of Defendant's Class Products in violation of the "untrue prong" of California Business and Professions Code § 17500.

313.    As a result of Defendant's violations of the "untrue prong" of California Business and Professions Code § 17500 *et seq.*, Defendant has been unjustly enriched at the expense of

1    Plaintiffs and the class.  Misbranded products cannot be legally sold or held and are legally

2    worthless.  Plaintiffs and the class paid a premium price for the Class Products.

3        314.    Plaintiffs and the class, pursuant to Business and Professions Code § 17535, are

4    entitled to an order enjoining such future conduct by Defendant, and such other orders and

5    judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any

6    money paid for Defendant's Class Products by Plaintiffs and the class.

7                            **SIXTH CAUSE OF ACTION**

8              **Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*.**

9        315.    Plaintiffs incorporate by reference each allegation set forth above.

10       316.    This cause of action is brought pursuant to the CLRA. Defendant's violations of

11   the CLRA were and are willful, oppressive and fraudulent, thus supporting an award of punitive

12   damages.

13       317.    Plaintiffs and the class are entitled to actual and punitive damages against

14   Defendant for its violations of the CLRA. In addition, pursuant to Cal. Civ. Code § 1782(a)(2),

15   Plaintiffs and the class are entitled to an order enjoining the above-described acts and practices,

16   providing restitution to Plaintiffs and the class, ordering payment of costs and attorney's fees, and

17   any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

18       318.    Defendant's actions, representations and conduct have violated, and continue to

19   violate the CLRA, because they extend to transactions that are intended to result, or which have

20   resulted, in the sale of goods or services to consumers.

21       319.    Defendant sold Class Products in California and in the United States during the

22   Class Period.

23       320.    Plaintiffs and members of the class are "consumers" as that term is defined by the

24   CLRA in Cal. Civ. Code §1761(d).

25       321.    Defendant's Class Products were and are "goods" within the meaning of Cal. Civ.

26   Code §1761(a).

27       322.    By engaging in the conduct set forth herein, Defendant violated and continues to

28   violate Section 1770(a)(5), of the CLRA, because Defendant's conduct constitutes unfair methods

1    of competition and unfair or fraudulent acts or practices, in that it misrepresents the particular

2    ingredients, characteristics, uses, benefits and quantities of the goods.

3          323.    By engaging in the conduct set forth herein, Defendant violated and continues to

4    violate Section 1770(a)(7) of the CLRA, because Defendant's conduct constitutes unfair methods

5    of competition and unfair or fraudulent acts or practices, in that Defendant misrepresents the

6    particular standard, quality or grade of the goods.

7          324.    By engaging in the conduct set forth herein, Defendant violated and continues to

8    violate Section 1770(a)(9) of the CLRA, because Defendant's conduct constitutes unfair methods

9    of competition and unfair or fraudulent acts or practices, in that Defendant advertises goods with

10   the intent not to sell the goods as advertised.

11         325.    By engaging in the conduct set forth herein, Defendant violated and continues to

12   violate Section 1770(a)(16) of the CLRA, because Defendant's conduct constitutes unfair

13   methods of competition and unfair or fraudulent acts or practices, in that Defendant represents

14   that a subject of a transaction has been supplied in accordance with a previous representation

15   when they have not.

16         326.    Plaintiffs request that the Court enjoin Defendant from continuing to employ the

17   unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2). If

18   Defendant is not restrained from engaging in these practices in the future, Plaintiffs and the class

19   will continue to suffer harm.

20         327.    Pursuant to Section 1782(a) of the CLRA, on June 25, 2012, Plaintiffs' counsel

21   served Defendant with notice of Defendant's violations of the CLRA.  As authorized by

22   Defendant's counsel, Plaintiffs' counsel served Defendant by certified mail, return receipt

23   requested. Defendant has not responded.

24         328.    Plaintiffs make certain claims in this Second Amended Complaint that were not

25   included in the original Complaint filed on May 4, 2012, and were not included in Plaintiffs'

26   CLRA demand notice.

27         329.    This cause of action does not currently seek monetary relief and is limited solely to

28   injunctive relief, as to Defendant's violations of the CLRA not included in the original

1   Complaint. Plaintiffs intends to amend this to seek monetary relief in accordance with the CLRA

2   after providing Defendant with notice of Plaintiffs' new claims pursuant to Cal. Civ. Code §

3   1782.

4          330.   At the time of any amendment seeking damages under the CLRA, Plaintiffs will

5   demonstrate that the violations of the CLRA by Defendant were willful, oppressive and

6   fraudulent, thus supporting an award of punitive damages.

7          331.   Consequently, Plaintiffs and the class will be entitled to actual and punitive

8   damages against Defendant for its violations of the CLRA. In addition, pursuant to Cal. Civ. Code

9   § 1782(a)(2), Plaintiffs and the class will be entitled to an order enjoining the above described

10  acts and practices, providing restitution to Plaintiffs and the class, ordering payment of costs and

11  attorney's fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal.

12  Civ. Code § 1780.

13  **JURY DEMAND**

14        Plaintiffs hereby demand a trial by jury of their claims.

15  **PRAYER FOR RELIEF**

16        WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, and

17  on behalf of the general public, pray for judgment against Defendant as follows:

18        A.   For an order certifying this case as a class action and appointing Plaintiffs and

19  their counsel to represent the class;

20        B.   For an order awarding, as appropriate, damages, restitution or disgorgement to

21  Plaintiffs and the class for all causes of action;

22        C.   For an order requiring Defendant to immediately cease and desist from selling its

23  Class Products listed in violation of law; enjoining Defendant from continuing to market,

24  advertise, distribute, and sell these products in the unlawful manner described herein; and

25  ordering Defendant to engage in corrective action;

26        D.   For all equitable remedies available pursuant to Cal. Civ. Code § 1780;

27        E.   For an order awarding attorney's fees and costs;

28        F.   For an order awarding punitive damages;

G.      For an order awarding pre-and post-judgment interest; and

H.      For an order providing such further relief as this Court deems proper.

Dated:  September 2, 2013.

Respectfully submitted,


*Pierce Gore*
Ben F. Pierce Gore (SBN 128515)
PRATT & ASSOCIATES
1871 The Alameda, Suite 425
San Jose, CA 95126
(408) 429-6506
pgore@prattattorneys.com

Charles Barrett
CHARLES BARRETT, P.C.
6518 Hwy. 100, Suite 210
Nashville, TN 37205
(615) 515-3393
charles@cfbfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed and served through the Court's ECF system a true and correct copy of the foregoing.


*Pierce Gore*